Opinion filed August 31, 2015



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00247-CV
_____

## TIMOTHY GARRETT LANE AND CHOAT ENTERPRISES, INC., Appellants

## V.

## SILVERIO MARTINEZ, II AND DIANA MARTINEZ, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF SILVERIO MARTINEZ, III, DECEASED, Appellees

### On Appeal from the 70th District Court
### Ector County, Texas
### Trial Court Cause No. A-133,142

### O P I N I O N

Appellees, Silverio Martinez, II and Diana Martinez, filed suit against Appellants, Timothy Garrett Lane and his former employer, Choat Enterprises, Inc., alleging wrongful death and survival claims arising from the death of their twenty-eight-year-old son, Silverio Martinez, III, in an automobile accident. The jury found

that the accident was caused by Lane's negligence, and it awarded damages to Appellees on their claims. The trial court entered judgment in accordance with the jury's verdict. In this appeal, Appellants challenge the factual sufficiency of the evidence to support the damages awarded by the jury to Appellees for past and future mental anguish and for past and future loss of companionship and society. Appellants also contend that Appellees' counsel made improper and incurable jury arguments and that the trial court committed evidentiary error. We affirm in part and reverse and remand in part for a new trial.

*Background Facts*

On February 8, 2012, at about 5:45 p.m., Silverio Martinez, III (Silver) traveled in his car in the westbound lane of State Highway 302, near Kermit, Texas. Lane traveled in a pickup that was owned by his employer, Choat, in the eastbound lane of the same highway. Lane crossed the center stripe of the highway in an effort to pass another vehicle, entered the westbound lane, and hit Silver's car head-on. Silver died on impact.

Silverio and Diana, in their individual capacities and as representatives of Silver's estate, brought a wrongful death and survival suit against Lane and Choat. Norma Jimenez also brought a wrongful death claim against Lane and Choat. Jimenez alleged that she was Silver's surviving spouse. In this opinion, we will sometimes refer to Silverio, Diana, and Jimenez collectively as the "Plaintiffs." The Plaintiffs alleged negligence and gross negligence claims against Lane and Choat. Specifically, the Plaintiffs alleged that Lane was in the course and scope of his employment with Choat at the time of the accident and that, therefore, Choat was vicariously liable for Lane's negligence under the doctrine of respondeat superior. The Plaintiffs also asserted direct negligence claims against Choat, based on allegations that Choat negligently hired Lane and negligently allowed Lane to

2

operate the pickup. The Plaintiffs sought to recover actual and exemplary damages from Lane and Choat.

At the outset of the trial, Choat stipulated that Lane was acting in the course and scope of his employment when the accident occurred. Based on this stipulation, Choat agreed that it was vicariously liable for the negligence of Lane, if any, that proximately caused the accident. *See Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998) (under the doctrine of respondeat superior, an employer is vicariously liable for the negligence of an employee acting within the scope of his employment, although the employer has not personally committed a wrong).

The Plaintiffs called Lane as a witness. When asked about the accident, Lane refused to testify and, instead, invoked his Fifth Amendment privilege against self-incrimination. The Plaintiffs presented evidence related to the accident through the testimony of other witnesses. Jimenez testified and presented other witnesses in an attempt to establish that she was Silver's common-law wife at the time of his death. Lane and Choat vigorously contested liability for the accident and Jimenez's claim that she was Silver's common-law wife. Silverio and Diana testified about the relationships they had with Silver before he died and how Silver's death had affected them.

After the parties concluded their presentation of evidence, the trial court granted directed verdicts in favor of Choat and Lane on the Plaintiffs' gross negligence claims. The trial court also granted a directed verdict in favor of Choat on the Plaintiffs' direct negligence claims against Choat. Thus, the only negligence question that the trial court submitted to the jury was, "Did the negligence, if any, of Timothy Lane proximately cause the occurrence in question?" The jury answered the question, "Yes." The trial court also submitted the question, "Were Silverio Martinez, III and Norma Jimenez married at the time of Silverio Martinez, III's

3

death?" The jury answered the question, "No." The damages question with respect to Jimenez's claim was conditioned on a "Yes" answer to the marriage question. Accordingly, the jury did not answer the damages question that related to Jimenez's claim.

The jury awarded pecuniary damages to Silverio and Diana as follows: (1) $5,500 each to Silverio and Diana for pecuniary loss sustained in the past and (2) $50,000 each to Silverio and Diana for pecuniary loss that, in reasonable probability, would be sustained in the future. The jury awarded non-pecuniary damages to Silverio and Diana as follows: (1) $234,250 each to Silverio and Diana for loss of companionship and society sustained in the past; (2) $234,250 each to Silverio and Diana for loss of companionship and society that, in reasonable probability, would be sustained in the future; (3) $234,250 each to Silverio and Diana for mental anguish sustained in the past; and (4) $234,250 each to Silverio and Diana for mental anguish that, in reasonable probability, would be sustained in the future. The jury awarded survival damages to Silverio, as the representative of Silver's estate, in the amount of $15,000 for Silver's funeral and burial expenses. In total, the jury awarded damages of $2,000,000 to Silverio and Diana. This amount included $1,874,000 in wrongful death non-pecuniary damages—a total of $937,000 each to Silverio and Diana for non-pecuniary damages. Based on the jury's verdict, the trial court rendered judgment that Silverio and Diana, individually and as representatives of Silver's estate, recover from Lane and Choat, jointly and severally, the amount of $2,058,439.55. This figure included prejudgment interest in the amount of $58,439.55. The trial court also rendered judgment that Jimenez take nothing by her claims against Lane and Choat.

### Issues

Appellants present four issues for review. In their first issue, Appellants contend that the evidence was factually insufficient to support the jury's awards of

4

damages to Silverio and Diana for past and future loss of companionship and society and for past and future mental anguish. In their second issue, Appellants assert that, because the jury's awards on the above elements of damages were not supported by factually sufficient evidence, the trial court erred by refusing to suggest a remittitur. Appellants contend in their third issue that the Plaintiffs' counsel made several "improper, highly prejudicial and incurable jury arguments" that probably caused the rendition of an improper verdict and that had a probable effect on the jury's damages findings. In their fourth issue, Appellants assert that the trial court erred in excluding evidence that Silverio, Diana, and Jimenez entered into a distribution agreement in which they agreed to share the proceeds of any recovery in this case.

*Factual Sufficiency of the Evidence of Non-Pecuniary Damages*

At the time of trial, Silverio was sixty years old, and Diana was fifty-four years old. Diana had serious medical problems and became disabled before Silver died. She had numerous back surgeries. She had a hearing problem that required her to wear hearing aids. Diana was treated for depression for several years before Silver died. Silverio and Diana had four children: Silver, Norma, Jacob, and Belen. Silver died the day before his twenty-ninth birthday. Silver did not have any children.

Silverio testified that he had a close relationship with Silver. Silverio had been a high school coach for more than twenty years. He had been a head soccer coach and had coached a number of other sports during his coaching career. At the time of trial, Silverio was the head soccer coach for the Brazosport Independent School District. He previously coached in Uvalde, where the family lived when Silver was in high school. Silverio coached Silver all four years that Silver attended Uvalde High School. Silver graduated from Uvalde High School.

In 2006, Silver bought a house in Freeport. Silverio accepted his coaching employment job with the Brazosport ISD. At that time, Silverio and Diana moved

from Uvalde to Freeport and lived with Silver in his house. Silver wanted the entire family to live in his house. In 2010, Silver moved to Odessa for an employment opportunity with Sun Electric. However, he still considered his house in Freeport to be his home. Silverio and Diana continued to live in Silver's house. After Silver moved to Odessa, he gave Silverio and Diana $500 a month to apply to the mortgage payment of his house. Silverio and Diana continued to live in Silver's Freeport house at the time of trial.

Silverio said that, after Silver moved to Odessa, he and Silver talked to each other or texted each other just about every day. Silverio said that he and Silver were "always constantly talking." They talked about how Silver was doing at work. Silver talked about what he wanted to do in the future. Silver always asked Silverio how he and Diana were doing. Silverio and Silver also talked about Jimenez and her children.

After Silver moved to Odessa, he visited Silverio and Diana in Freeport almost every month. Silverio testified that Silver visited them over Thanksgiving in 2011. Silver told Silverio about a job offer that he had received from Bird Electric. Silverio advised Silver to take the job. Silver followed Silverio's advice and accepted the offer. Silver named his parents as beneficiaries on the life insurance policy that he received through his employment with Bird.

Silverio said that Silver was very outgoing, was a "go-getter," and had a bright future ahead of him. Silverio testified that he and Silver both had commercial driver's licenses. Silverio said that he and Silver had "plans and dreams of working together" after Silverio retired from coaching. Silver hoped to one day own his own trucking or construction company and wanted Silverio to work with him. Silverio said that he and Silver enjoyed working on cars together. They also went hunting together.

6

Silverio last talked with Silver the day before Silver died. On the day of the accident, Silverio's high school boys' soccer team had a game in Victoria, Texas. After the game, Silverio drove the team home in the team bus. Silverio received a telephone call on his cell phone during the trip home. He noticed that the caller identification on his cell phone said "DPS." He stopped the bus and called the number. A DPS Trooper answered the call. The trooper said that he was at Silverio's house in Freeport and that nobody was answering the door. The trooper wanted to talk to Silverio. Silverio told the trooper that he was more than an hour away from Freeport. Silverio asked the trooper whether he could tell him what the call was about on the phone. The trooper said that he would rather talk to Silverio in person. The trooper told Silverio to call him when Silverio got home. Silverio called his daughter, Norma, and asked her to check on Diana at the house. Norma arrived at the house to check on Diana and determined that Diana was okay.

Silverio called the trooper when he got home. The trooper told Silverio that he was going to send another trooper to the house. About thirty minutes later, the trooper and two Freeport police officers arrived at the house. The trooper told Silverio, Diana, and Norma that Silver had been involved in a head-on automobile collision near Kermit and that Silver had passed away. Silverio testified that he, Diana, and Norma were "all crying" and that Diana started getting chest pains. The police called emergency personnel to the scene, and the personnel examined Diana. The emergency personnel advised Silverio to call them back if Diana's condition worsened.

Silverio testified that he and Diana "haven't been the same" ever since Silver's death. He said that "[i]t's just been so hard." Silverio said that Diana has been "holding on" and was "[h]eavily depressed." He said that "she has it even harder, because since she doesn't work because she's disabled, she's at home. I mean, that's all she thinks about." He said Silver's death had been "real hard" on both of them.

Silverio said that "it's just unbearable" and that "[he] wouldn't wish this on [his] worst enemy."

Diana testified that Silver always had a smile on his face and that he never liked to see anybody sad. She said that Silver loved children and that "he would have been the best father and grandfather in the world." Diana testified that, when Silver saw her, he "would come and hug [her] and he would just squeeze the air out of [her], and [she] would have to push him away so [she] could take a deep breath." She said that, if Silver were still alive, she would never push him away again.

Diana was at home on the day of Silver's accident. She testified that she did not hear the trooper knock on the door because she had taken her hearing aids out. She said that, when the trooper told them about Silver's death, she kept asking the trooper over and over whether he was sure about the wreck. Diana said that she had "nightmares of [Silver] crying as if he was a little boy, telling me help me, Mommy. Help me." Diana also said that she wanted to die so that she could see Silver. She said that she was "just waiting to die."

Adolfo Gonzales was Silver's supervisor at Bird Electric and at a prior job. Gonzales testified that Silver talked with him about Silverio and Diana. Gonzales said that Silver talked a lot about Silverio. Gonzales believed that Silver had a close relationship with Silverio.

We review an excessive damages complaint for factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1988); *Thomas v. Uzoka*, 290 S.W.3d 437, 454 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). In a factual sufficiency review, we are to consider and weigh all of the evidence both supporting and contradicting the finding in question. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We will set aside the finding only if the evidence supporting it is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Dow Chem. Co. v.*

*Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

In wrongful death cases, mental anguish damages and loss of companionship and society damages both compensate for noneconomic losses. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986). However, these two elements of damages are separate and do not overlap. *Id.*; *Thomas*, 290 S.W.3d at 455. In wrongful death cases, mental anguish is the emotional pain, torment, and mental suffering that the plaintiff experienced as a result of the death of a family member. *Plasencia v. Burton*, 440 S.W.3d 139, 148 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Thomas*, 290 S.W.3d at 455. Damages for mental anguish are intended to compensate the beneficiary for the deleterious effect that the wrongful death had on the beneficiary. *Moore*, 722 S.W.2d at 688; *Thomas*, 290 S.W.3d at 455. To recover for mental anguish, a claimant must demonstrate a high degree of mental suffering beyond disappointment, anger, resentment, or embarrassment, although mental anguish may include all these emotions. *Thomas*, 290 S.W.3d at 455. Proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, despair, public humiliation, or a combination of any or all of those feelings. *Id.*

By contrast, damages for loss of companionship and society are intended to compensate the beneficiary for the positive benefits flowing from the love, comfort, companionship, and society that the beneficiary would have received had the decedent lived. *Moore*, 722 S.W.2d at 687–88; *Thomas*, 290 S.W.3d at 455. Thus, while mental anguish emphasizes the negative impact that the wrongful death had on the beneficiary, loss of companionship and society focuses on the removal of positive benefits that the beneficiary once enjoyed but which were taken away by the wrongful death. *Moore*, 722 S.W.2d at 688; *Plasencia*, 440 S.W.3d at 148. Although mental anguish is distinguishable from loss of companionship and society,

the jury may consider some of the same factors in awarding damages for both of the elements. Those factors include (1) the relationship between the decedent and the beneficiary, (2) the living arrangements of the parties, (3) any absence of the deceased from the beneficiary for extended periods, (4) the harmony of family relations, and (5) the parties' common interests and activities. *Moore*, 722 S.W.2d at 688; *Thomas*, 290 S.W.3d at 456.

The nebulous issues of mental anguish and loss of companionship and society are "inherently somewhat imprecise." *Thomas*, 290 S.W.3d at 454. Because these damages are unliquidated and incapable of precise mathematical calculation, the jury is given significant discretion in fixing the amount of the award. *Id.* However, that discretion is limited. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996); *see Plasencia*, 440 S.W.3d at 148.

Appellants rely heavily on the Texas Supreme Court's opinion in *Saenz* in making their factual sufficiency challenge to the jury's non-pecuniary damage awards. *Saenz* involved a claim against a workers' compensation carrier for wrongfully inducing a settlement with the claimant. *Saenz*, 925 S.W.2d at 608. The jury found that the plaintiff suffered damages of $50,000 for past mental anguish and $200,000 for future mental anguish. *Id.* at 613–14. As noted by the court, the only evidence supporting any recovery for mental anguish was a single question and answer where the plaintiff indicated that she worried a lot about being able to pay for her house because of her loss of income. *Id.* at 614. The court stated as follows in reaching its decision:

> Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded. We disagree with the court of appeals that "[t]ranslating mental anguish into dollars is necessarily an arbitrary process for which the jury is given no guidelines." While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. *Juries cannot*

10

*simply pick a number and put it in the blank.* They must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. Compensation can only be for mental anguish that causes "substantial disruption in . . . daily routine" or "a high degree of mental pain and distress." There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. Reasonable compensation is no easier to determine than reasonable behavior— often it may be harder—but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations.

*Id.* (alterations in original) (emphasis added) (citations omitted).

The supreme court revisited its holding in *Saenz* in *Bentley v. Bunton*, 94 S.W.3d 561, 605–07 (Tex. 2002), a plurality opinion.[1] *Bentley* was a defamation case brought by a public official. 94 S.W.3d at 566–67. The jury found damages of $7,000,000 for mental anguish and $150,000 for damages to character and reputation. *Id.* at 605. The court noted that noneconomic damages "cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment. But the necessity that a jury have some latitude in awarding such damages does not, of course, give it carte blanche to do whatever it will . . . ." *Id.* The court continued:

[U]nder our common law the latitude necessarily accorded a jury in assessing non-economic damages does not insulate its verdict from appellate review for evidentiary support. Just as a jury's prerogative of assessing the credibility of evidence does not authorize it to find liability when there is no supporting evidence or no liability in the face of unimpeachable evidence, so a large amount of mental anguish damages cannot survive appellate review if there is no evidence to support it, or a small amount of damages when the evidence of larger damages is conclusive. The jury is bound by the evidence in awarding damages, just as it is bound by the law.

---

[1]As subsequently noted by the supreme court in *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013), this portion of the court's opinion in *Bentley* is a plurality opinion.

*Id.* at 605–06. The court stated that the courts of appeals are authorized to determine whether damage awards are supported by insufficient evidence—that is, whether the amount of damages awarded are excessive or unreasonable. *Id.* at 606. The court concluded in *Bentley* that there was no evidence to support the jury's determination that the plaintiff suffered $7,000,000 in mental anguish damages. *Id.* at 607. In reaching this holding, the court noted that the amount awarded by the jury for mental anguish damages was over forty times more than the amount it awarded for damages to the plaintiff's reputation. *Id.* Thus, under *Bentley* and *Saenz*, there must be both evidence of the existence of compensable non-pecuniary damages and evidence to justify the amounts awarded. *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013) (citing *Bentley*, 94 S.W.3d at 606; *Saenz*, 925 S.W.2d at 614).

Appellants focus their challenge on the factual sufficiency of the evidence supporting the amounts found by the jury for non-pecuniary damages. The supreme court recently addressed the evidentiary standard applicable to the amounts awarded for non-pecuniary damages. *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 153 (Tex. 2014). Citing the Restatement (Second) of Torts section 905, the court stated that "non-pecuniary damages do not require certainty of actual monetized loss. Instead, they are measured by an amount that 'a reasonable person could possibly estimate as fair compensation.'" *Id.* (footnote omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 905 cmt. i (1979)).

Appellants contend that the jury in this case violated *Saenz*'s prohibition of simply picking numbers and putting them in the blanks. Choat's counsel presented this argument at the hearing on the motion for new trial when he argued: "The jury went back and clearly picked a number of $2,000,000 in less than a[n] hour. Backed out 111,000 in support, 15,000 in funeral expenses and then divided that by eight and came up with the exact same amount for eight different damage claims, 234,500." Appellants also rely heavily on the opinion from the Beaumont Court of

Appeals in *Hawkins v. Walker* to support their argument that the evidence was factually insufficient to support the jury's awards of non-pecuniary damages to Silverio and Diana. *Hawkins v. Walker*, 238 S.W.3d 517, 527 (Tex. App.—Beaumont 2007, no pet.).

In *Hawkins*, the jury awarded a total of $1,700,000 in damages to a mother for past and future mental anguish and for past and future loss of companionship and society arising from the death of her twenty-six-year-old daughter. *Id.* at 519–20. The total amount included awards of $500,000 for past loss of companionship and society, $500,000 for future loss of companionship and society, $500,000 for past mental anguish, and $200,000 for future mental anguish. *Id.* at 520. The trial court entered a judgment based on the jury's verdict. *Id.* The Beaumont Court of Appeals, in a two-to-one decision, held that the evidence was factually insufficient to support the jury's damage awards to the mother for mental anguish and loss of companionship and society. *Id.* at 532. Therefore, the court reversed the trial court's judgment in favor of the mother and remanded the mother's claims to the trial court for a new trial. *Id.* at 520.

The court in *Hawkins* began its analysis by noting that the matter of whether factually sufficient evidence supports the damages awarded by the jury for non-pecuniary losses is a difficult question. *Id.* at 526–27. As stated by the court: "A court that reduces a jury's damage award faces criticism that it is not sympathetic to the loss suffered by the survivors. On the other hand, jury verdicts perceived as being excessive result in legislative efforts to cap the amounts that can be awarded in judgments, regardless of the damage suffered by the victim." *Id.* at 527. The court additionally noted that the remedy that allows a parent to recover non-pecuniary damages for the death of a child is a relatively recent one. *Id.* (citing *Sanchez v. Schindler*, 651 S.W.2d 249, 251 (Tex. 1983)).

In *Hawkins*, during the last few years of the daughter's life, the mother and daughter saw each other several times a week and frequently talked with each other on the telephone. *Id.* at 525. They ate together several times a week. *Id.* The mother occasionally went shopping with her daughter, bought groceries for her daughter, paid her daughter's bills, and took her daughter to doctor's appointments. *Id.* The mother learned of her daughter's death during a telephone call. *Id.* at 525–26. She said that she could not believe she would never see her daughter again. *Id.* at 526. The mother testified that, when she learned of her daughter's death, she began screaming and could not stop. *Id.* The mother said that she loved her daughter very much, that she missed her daughter, and that she thought about her daughter every day. *Id.*

The court in *Hawkins* explained that, while there was evidence that the mother and the decedent had a loving relationship, there was no testimony that the mother was dependent on the decedent or that the mother continued to suffer a severe grief reaction after her initial shock from learning of the decedent's death. *Id.* at 527. The court found it significant that there was no evidence that the mother suffered from depression as a result of her daughter's death, that the mother required any medical treatment to cope with her daughter's death, that the mother could no longer work as a result of her daughter's death, or that the daughter's death significantly interfered with the mother's daily activities. *Id.* The court noted the absence of evidence that the mother missed any work or changed her daily activities as a result of her daughter's death, that the mother was financially dependent on her daughter, or that the mother relied on the daughter for any advice or household services. *Id.*

The *Hawkins* court then conducted a thorough examination of Texas and Fifth Circuit cases that involved factual sufficiency challenges to jury awards of non-pecuniary damages in wrongful death cases. *Id.* at 527–31. The court stated that "[it had] located only one case in which a Texas appellate court affirmed a jury award

of more than $300,000 for a parent when the evidence did not include testimony consistent with the conclusion that the parent suffered severe mental anguish or severe grief because of the child's death." *Id.* at 527–28. The court noted that "[t]here are reported Texas cases that affirm wrongful death awards for non-pecuniary damages of up to $300,000 when the evidence showed a close relationship but did not show any significant interference in the wrongful death beneficiary's daily activities." *Id.* at 528. The *Hawkins* court explained that the Fifth Circuit had affirmed large non-pecuniary damage awards when the testimony demonstrated "a severe depressive reaction lasting an unusually long time." *Id.* at 530. However, the court also noted that the Fifth Circuit had reversed such awards "when the evidence showed only a loving relationship between the decedent and the survivor." *Id.* at 529. The court stated that, "[i]n our view, testimony that proves the beneficiary suffered severe mental anguish or severe grief should be a significant and sometimes determining factor in a factual sufficiency analysis of large non-pecuniary damage awards." *Id.* at 532.

The court in *Hawkins* determined that *Saenz* requires appellate courts "to conduct a meaningful review of a jury's non-pecuniary damage awards in a wrongful death case, which, in turn, requires evidence 'that the amount found is fair and reasonable compensation.'" *Id*. at 531 (quoting *Saenz*, 925 S.W.2d at 614). The court additionally determined that "large non-pecuniary damage awards" required proof that the wrongful death beneficiary suffered severe mental anguish or severe grief. *Id*. at 532. The court concluded that the evidence, which consisted of the mother's testimony "that she had a close and loving relationship with [her daughter] and ate with [her daughter] regularly" was insufficient to support the jury's $1.7 million award of non-pecuniary damages because there was insufficient evidence to establish that the mother suffered severe emotional trauma that resulted in a lengthy depression or other severe secondary reaction or that the daughter's

15

death resulted in a serious and permanent interference with the mother's daily activities. *Id.*

Appellants assert that the evidence in this case is similar to the evidence in *Hawkins*. In reliance upon this assertion, Appellants contend that there was factually insufficient evidence to surpass the evidentiary threshold required for large non-pecuniary damage awards. They state that, "while there is some evidence (similar to *Hawkins*) that [Silverio and Diana] had a loving relationship with Decedent, who was one of their several children, there is insufficient evidence to establish that [they] had severe emotional trauma that resulted in other severe secondary reactions." Appellants assert that, similar to *Hawkins*, there was no evidence that Silver's death resulted in a serious and permanent interference with either Silverio's or Diana's daily activities, that either Silverio or Diana sought counseling or medical treatment to cope with Silver's death, or that Silverio or Diana suffered from depression attributable to Silver's death.

The evidence in this case is distinguishable from *Hawkins*. In this case, the evidence showed that Silverio and Diana had close relationships with Silver and that they had suffered enormous grief and would continue to suffer grief as a result of Silver's death. Silverio and Diana lived with Silver a number of years in Freeport before he moved to Odessa. After he moved, he returned to Freeport approximately once a month to visit his parents. Silverio and Silver communicated with each other on an almost daily basis. Silverio and Diana both testified about the profound impact that Silver's death has had on their lives. Silverio testified that "we haven't been the same ever [since Silver died]," that "[i]t's just been so hard," that Diana had been "[h]eavily depressed," that Silver's death had been harder on Diana because "she's at home [and] that's all she thinks about," that "it's just unbearable," and that "[he] wouldn't wish this on [his] worst enemy." Diana testified that she had "nightmares of [Silver] crying as if he was a little boy, telling [her] help me, Mommy," that she

16

wanted to die so that she could see Silver, and that she was "just waiting to die." The evidence supports a conclusion that Silverio and Diana both suffered and would continue to suffer severe grief as a result of Silver's death.

Accordingly, the evidence in this case was stronger than the evidence in *Hawkins* to support the jury's large non-pecuniary damage awards.[2]  Our inquiry does not end at this point, however, because we must still conduct a "meaningful evidentiary review" of the amounts found by the jury for non-pecuniary damages. *Saenz*, 925 S.W.2d at 614.  We must review the factual sufficiency of the evidence supporting the jury's awards of non-pecuniary damages to determine if the awards constitute what a reasonable person could possibly estimate as fair compensation to Silverio and Diana. *Waste Mgmt.*, 434 S.W.3d at 153.  Appellants contend that the jury simply picked numbers and put them in the blanks in violation of *Saenz*'s prohibition of this practice.  We agree.

As noted previously, one justice filed a dissenting opinion in *Hawkins*. Justice Kreger opined that the jury did not "simply pick a number and put it in the blank" because it awarded different amounts for past mental anguish damages versus future mental anguish damages. *Hawkins*, 238 S.W.3d at 534–35.  We agree with Justice Kreger that a jury's act of awarding different damage amounts for different damage elements supports a conclusion that the jury did not randomly award damages in a case.  We addressed a similar situation in *Service Corp. International v. Aragon*, 268 S.W.3d 112, 121–22 (Tex. App.—Eastland 2008, pet. denied).  We concluded that it was "evident that the jury did not simply pick numbers at random but gave careful consideration" to its award of past and future mental anguish damages because it awarded different amounts for different claimants. *Id.* at 121.

---

[2]For the purposes of our analysis, we will use the same amount of $300,000, as used by the court in *Hawkins*, as the threshold amount for large non-pecuniary damage awards in a wrongful death case.

We noted that the jury in *Aragon* distinguished between different plaintiffs and that it awarded higher damages to the plaintiff that was most obviously impacted. *Id.* We also noted that *Aragon* did not involve pecuniary damages to use as a benchmark for assessing the non-pecuniary damages. *Id.*

The challenged non-pecuniary damage awards in this case consist of eight damage "blanks" wherein the jury filled in the same amount: $234,500. The eight blanks pertained to the following damage items:

1. Silverio's loss of companionship and society sustained in the past;
2. Diana's loss of companionship and society sustained in the past;
3. Silverio's loss of companionship and society that will be sustained in the future;
4. Diana's loss of companionship and society that will be sustained in the future;
5. Silverio's mental anguish sustained in the past;
6. Diana's mental anguish sustained in the past;
7. Silverio's mental anguish that will be sustained in the future;
8. Diana's mental anguish that will be sustained in the future.

As determined by the jury, Silverio and Diana suffered the same amount of non-pecuniary damages. Additionally, their respective damages for loss of companionship and society were the same as their respective mental anguish damages, and the past component of these damages was the same as the future component of these damages. Unlike the jury in *Aragon*, it appears that the jury in this case did not give careful consideration to each of the damage elements but, rather, picked a number at random and just filled in the blanks. This conclusion is bolstered by the fact that the jury awarded a "round" number of $2,000,000 in total damages calculated by subtracting the pecuniary damages that it awarded and then dividing the remainder by eight.

We also have an award of pecuniary damages in this case to use as a benchmark. The jury awarded Silverio and Diana pecuniary damages of $55,500

each.[3] The jury's award of $937,000 each to Silverio and Diana for non-pecuniary damages is almost seventeen times more than their respective award of pecuniary damages. This large ratio of non-pecuniary damages to pecuniary damages, coupled with the large amount of non-pecuniary damages awarded in this case when compared to other reported cases, and the apparent act of the jury of simply picking a number and putting it in the blanks lead us to the conclusion that the jury's awards of non-pecuniary damages is not supported by factually sufficient evidence. The jury's awards do not constitute what a reasonable person could possibly estimate as fair compensation to Silverio and Diana—had the jury considered the non-pecuniary damage elements separately as required by the court's charge.

Appellants contend that the jury "was more likely than not influenced by" improper closing arguments and the trial court's evidentiary error.[4] Appellants continue that, "[t]o that end, the record demonstrates that the jury's award of non-pecuniary damages . . . was more likely than not arrived at by some improper motive such as passion, prejudice or speculation." We would additionally note that the jury may have been influenced by damage evidence presented on behalf of Jimenez, who sought loss of Silver's future earning capacity in the approximate amount of $2,000,000. We sustain Appellants' first issue.

*Remittitur*

In their second issue, Appellants argue that the trial court erred in refusing to suggest a remittitur of the non-pecuniary damages awarded to Silverio and Diana. Appellants additionally request a suggestion of remittitur from this court. *See* TEX. R. APP. P. 46.3. Appellants contend that this court should suggest a remittitur

---

[3]The jury awarded Silver's estate $15,000 for funeral and burial expenses under a survival cause of action. We have not included this amount in our comparative analysis because it is not a recovery by the wrongful death claimants.

[4]These allegations are the subject of Appellants' third and fourth issues that we do not reach because of our disposition on Appellants' first issue.

that would reduce the total amount of non-pecuniary damages awarded to Silverio and Diana to $250,000 each.

The standard for reviewing whether a trial court should have ordered a remittitur is factual sufficiency. *Bentley*, 94 S.W.3d at 620. While a suggestion of remittitur is appropriate to enter in cases where there is insufficient evidence to support the full amount of a damages award, we decline to do so in this case because there is not an appropriate remittitur amount readily determinable from the evidence in this case. *Cf. Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 162 (Tex. App.—Eastland 2009, pet. dism'd). For the same reason, the trial court did not err in denying Appellants' requested remittitur. We overrule Appellants' second issue.

*Disposition*

In light of our disposition of Appellants' first issue, we need not address their third and fourth issues. *See* TEX. R. APP. P. 47.1. Appellants request a remand solely on the matter of Appellees' damages. Rule 44.1(b) of the Rules of Appellate Procedure provides that, in cases involving claims of unliquidated damages, "[t]he court may not order a separate trial solely on unliquidated damages if liability is contested." TEX. R. APP. P. 44.1(b). Mental anguish damages and loss of society and companionship damages are unliquidated damages. *See Thomas*, 290 S.W.3d at 454. Appellants contested liability at trial. Under Rule 44.1(b), we would err if we only remanded the damages part of the case. Instead, we are required to remand the case to the trial court for a new trial on liability and damages. *See JLG Trucking, LLC v. Garza*, No. 13–0978, 2015 WL 1870072, at *6 n.8 (Tex. Apr. 24, 2015) (not yet released for publication) ("[B]ecause liability was contested in the trial court, both liability and damages must be remanded."); *Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex. 2001) (per curiam) (applying Rule 44.1(b)).

As previously noted, the trial court granted a directed verdict in favor of Appellants on Silverio's and Diana's claims for gross negligence against Choat and

Lane and on their claims for direct negligence against Choat. Silverio and Diana have not challenged the trial court's judgment pertaining to these claims. Additionally, Jimenez originally filed a notice of appeal but she later filed a motion to dismiss her appeal. We issued an opinion and judgment on April 3, 2014, granting her requested dismissal. Lastly, Appellants have not challenged the claim of Silver's estate for funeral and burial expenses. Accordingly, these portions of the trial court's judgment are affirmed.

The portions of the trial court's judgment pertaining to Lane's direct negligence, Choat's vicarious liability, and Silverio's and Diana's damages are reversed and remanded for a new trial.

*This Court's Ruling*

We affirm the judgment of the trial court in part, reverse the judgment of the trial court in part, and remand the cause for proceedings consistent with this opinion.


JOHN M. BAILEY

JUSTICE


August 31, 2015

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

21