

NUMBER 13-16-00423-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JOEL LAWHORN,                                                                                     Appellant,

v.

ADAM HIDINGER, INDIVIDUALLY,
JODI HIDINGER, INDIVIDUALLY
AND LORI MCCOOL, AS INDEPENDENT
ADMINISTRATOR OF THE ESTATE OF
SETH DARRELL HIDINGER,                                                              Appellees.

On appeal from the 25th District Court
of Gonzales County, Texas.

# MEMORANDUM OPINION

**Before Justices Contreras, Benavides, and Longoria**
**Memorandum Opinion by Justice Longoria**

This is an appeal following a trial brought under the Texas Wrongful Death Act and

Texas Survival Statute.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 71.002, 71.021 (West,

Westlaw through 2017 1st C.S.). Joel Lawhorn,[1] appellant, and Seth Hidinger were involved in a collision in which Lawhorn was driving a pickup truck that struck Seth's motorcycle, causing Seth's death.

Appellees Adam and Jodi Hidinger, Seth's parents, along with Seth's estate[2] sued Lawhorn. Following a trial, the jury found in favor of the appellees and the estate, finding Lawhorn to be 98% at fault for the collision. The trial court subsequently signed a judgment based on the jury's verdict awarding plaintiffs a total recovery of $4,448,516.50, including prejudgment interest.

Lawhorn raises two issues in this appeal. In his first issue Lawhorn challenges the court's admission of testimony by two Department of Public Safety (DPS) troopers, arguing that it was improper to allow the troopers to testify as to causation. Because we find that Trooper Ronald Holub was qualified to give an opinion as to causation and Lawhorn did not preserve his complaint as to Trooper Christopher Germany, we overrule his first issue.

In his second issue, Lawhorn challenges the sufficiency of the evidence supporting the pecuniary and non-pecuniary damages awarded to Jodi and Adam. We conclude that the jury's non-pecuniary damage awards are supported by factually sufficient evidence, and we therefore affirm the judgment as to those damages. But because the evidence is factually insufficient to support the award of pecuniary damages awarded to Adam and Jodi, we reverse the judgment as to those damages and remand for a new

---

[1] On April 26, 2018, counsel for appellant notified this Court of Lawhorn's passing on March 31, 2018. He remains a party to the appeal. *See* TEX. R. APP. P. 7.1(a)(1).

[2] Lawhorn does not challenge the awards made to the estate of Seth Hidinger; therefore, the estate is not a party to this appeal.

trial. If a remittitur of the unsupported damages is timely filed, we will modify the trial court's judgment and affirm as modified.

## I. BACKGROUND

On June 4, 2013, Seth and a friend were riding their motorcycles on State Highway 183 towards Victoria, Texas. Seth was not wearing a helmet. A pickup truck, driven by Joel Lawhorn, pulled out of a private driveway and began to cross State Highway 183 in front of the motorcycles. According to Seth's friend, when braking to avoid Lawhorn's truck, Seth's rear motorcycle tire locked up, causing his motorcycle to go down and slide into the bottom of the pickup truck. The pickup truck drove over Seth and his motorcycle before pulling to the side of the highway. Seth was killed as a result of the injuries sustained in the incident. At the time of the incident, Seth was 25 years old and Lawhorn was 89 years old.

Adam, Jodi, and the administrator of Seth's estate brought suit against Lawhorn pursuant to the Texas Wrongful Death Act and the Texas Survival Statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 71.002, 71.021. A jury returned a verdict for the plaintiffs. This appeal followed.

## II. TESTIMONY OF DPS TROOPERS

By his first issue, Lawhorn asserts that the trial court's admission of the testimony of DPS Troopers Ronald Holub and Christopher Germany regarding causation was error. Lawhorn argues that the causation testimony offered by both Trooper Holub and Trooper Germany was inadmissible as neither were qualified to offer such an opinion in this case. The Hidingers maintain that both troopers were qualified; and if any error is found, it was harmless.

3

**A.  Standard of Review and Applicable Law**

We review evidentiary rulings, including rulings on expert testimony, for an abuse of discretion. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).  The trial court abuses its discretion only if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).  "[A] witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."  TEX. R. EVID. 702.  "A two-part test governs whether expert testimony is admissible:  (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation."  *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) (citing *Robinson*, 923 S.W.2d at 556).

**1.  Trooper Holub**

Trooper Holub testified that he graduated from the police academy in 1989 and began working as a deputy.  His career led him to become a trooper with DPS and he had eighteen years of experience as a trooper at the time of trial.  During his career, he received training in accident reconstruction and was a trained as a level two crash investigator.  He estimated that he has investigated over 1,000 traffic accidents during his career.  In addition to his own investigations, Trooper Holub's duties include reviewing all traffic crashes to determine if additional investigation is needed by the investigating trooper.  Trooper Holub explained further that there are five levels of training within DPS for accident reconstruction.  He does not hold himself out as an accident reconstructionist, but rather an experienced accident investigator.  Given his extensive experience, additional training, and enhanced job duties regarding accident investigation, we

4

conclude Trooper Holub's qualifications were sufficient for him to give an opinion concerning the cause of the accident. *See Ter-Vartanyan v. R & R Freight, Inc.*, 111 S.W.3d 779, 781–82 (Tex. App.—Dallas 2003, pet. denied) (finding that eight-year officer trained and certified in accident investigations with experience investigating hundreds of accidents had sufficient qualifications to opine as to causation).

Lawhorn presented his own accident reconstructionist expert, Brett Munyon, to criticize the opinion of Trooper Holub. Munyon testified that the fault was shared by Lawhorn and Hidinger, mostly explaining that Hidinger should have taken evasive action and could have avoided the accident. Munyon testified as to what he believed were deficiencies in Trooper Holub's investigation. Lawhorn contends the things Trooper Holub could not or did not do—such as forensic mapping, determining the speed of the vehicles, determining when exactly Hidinger began to brake his motorcycle, the distance of the skid marks, and total accident reconstruction—make his opinion inadmissible and unreliable. However, those are factors for the jury to consider when determining what weight to give Trooper Holub's opinions, not the admissibility of the opinions themselves. *See id.* at 782 (stating that things an officer did not do goes to the weight that the jury gives the opinion). Accordingly, we conclude the trial court did not err in admitting Trooper Holub's expert testimony. *See id.*; *see also Robinson*, 923 S.W.2d at 558.

### 2. Trooper Germany

Lawhorn argues that Trooper Germany's testimony was also inadmissible as to causation. To preserve a complaint for appellate review, a party must both (1) make a timely request, objection, or motion stating the specific grounds, and (2) secure the court's ruling on its request, objection, or motion, or object to the trial court's refusal to rule. TEX.

5

R. APP. P. 33.1(a)(1), (2). While Lawhorn filed a pre-trial motion to limit or exclude the testimony of Trooper Germany, the record does not reflect any adverse ruling as to the admissibility of Trooper Germany's testimony nor any objection made during the testimony of Trooper Germany. Therefore, no complaint was preserved for our review. *See id*.

We overrule Lawhorn's first issue.

### III.    DAMAGES

By his second issue, Lawhorn argues that the evidence is factually insufficient to support the award of pecuniary and non-pecuniary damages to Adam and Jodi.[3] Adam and Jodi were each awarded, individually: (1) $200,000 for loss of companionship and society sustained in the past; (2) $500,000 for loss of companionship and society that will be sustained in the future; (3) $1,000,000 for mental anguish sustained in the past; (4) $250,000 for mental anguish that will be sustained in the future; and (5) $100,000 for pecuniary loss that will be sustained in the future.

### A.    Standard of Review

We review an excessive damages complaint for factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998); *Thomas v. Uzoka*, 290 S.W.3d 437, 454 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). In a factual sufficiency review, we are to consider and weigh all of the evidence both supporting and contradicting the finding in question. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We will set aside the finding only if the evidence supporting it is so weak

---

[3] Though Lawhorn titles his argument as a challenge to the legal and factual sufficiency of the evidence, his brief only contains an argument as to factual sufficiency, which we address in this memorandum opinion.

6

or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Lane v. Martinez*, 494 S.W.3d 339, 345 (Tex. App.—Eastland 2015, no pet.).

**B.    Applicable Law**

In wrongful death cases, mental anguish damages and loss of companionship and society damages both compensate for noneconomic losses. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986). However, these two elements of damages are separate and do not overlap. *Id*.; *Thomas,* 290 S.W.3d at 455. In wrongful death cases, mental anguish is the emotional pain, torment, and mental suffering that the plaintiff experienced as a result of the death of a family member. *Plasencia v. Burton*, 440 S.W.3d 139, 148 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Thomas,* 290 S.W.3d at 455. Damages for mental anguish are intended to compensate the plaintiff for the deleterious effect that the wrongful death had on the plaintiff. *Moore,* 722 S.W.2d at 688; *Thomas,* 290 S.W.3d at 455. To recover for mental anguish, a claimant must demonstrate a high degree of mental suffering beyond disappointment, anger, resentment, or embarrassment, although mental anguish may include all these emotions. *Thomas,* 290 S.W.3d at 455. Proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, despair, public humiliation, or a combination of any or all of those feelings. *Id*.; *see Lane*, 494 S.W.3d at 345.

Damages for loss of companionship and society are intended to compensate the plaintiff for the positive benefits flowing from the love, comfort, companionship, and society that the plaintiff would have received had the decedent lived. *Moore,* 722 S.W.2d

7

at 687–88; *Thomas,* 290 S.W.3d at 455. Thus, while mental anguish emphasizes the negative impact that the wrongful death had on the plaintiff, loss of companionship and society focuses on the removal of positive benefits that the plaintiff once enjoyed but which were taken away by the wrongful death. *Moore*, 722 S.W.2d at 688; *Plasencia,* 440 S.W.3d at 148.

The nebulous issues of mental anguish and loss of companionship and society are "inherently somewhat imprecise." *Lane*, 494 S.W.3d at 346 (citing *Thomas*, 290 S.W.3d at 454). Because these damages are unliquidated and incapable of precise mathematical calculation, the jury is given significant discretion in fixing the amount of the award. *Id*. However, that discretion is limited. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996); *see Plasencia* 440 S.W.3d at 148.

"The duty of the intermediate appellate court, thankfully, is not to determine *ab initio* the quality, quantity, and unit value of the components of the intangibles, but rather to determine if the value found by the jury is so against the evidence, or unsupported by the evidence, so as to be manifestly unjust." *Guzman v. Guajardo*, 761 S.W.2d 506, 511 (Tex. App.—Corpus Christi 1988, writ denied) (emphasis in original).

## C. Evidence Presented

### 1. Testimony of Jodi Hidinger

At the time of trial, Jodi was fifty years old and she had been married to Adam for thirty-one years. Together she and Adam had two children, Seth and Shane. Jodi had been a massage therapist for nineteen years and had her own massage therapy business in Pennsylvania.

At the time of his death, Seth was twenty-five. Seth worked as a mechanic and was very independent, but always kept close ties with home. Jodi explained that when Seth first began working as a mechanic, he moved to Philadelphia for an eighteen-month program. During that time, she and Seth would visit each other and spend time together. After the program, Seth purchased his own house only about twenty minutes from where Jodi and Adam lived. Shane lived in Seth's house. Jodi testified that she and Seth "talked all the time."

In 2011, Seth got a job offer and moved to Texas. While living in Texas, Seth "loved to come home." Jodi testified that they saw Seth for most holidays; Seth would either go to Pennsylvania or they would go to Texas. They also planned vacations together. While Seth lived in Texas, Jodi and Seth talked almost every day, whether through text or phone calls. She testified that Seth was her best friend. She explained that she and Seth had a special bond: "He cherished me. He protected me. He encouraged me because he had this wisdom that I just wish everyone could know."

Jodi and Seth last spoke the day before the accident. She testified that she was at work when her son Shane called to tell her that Seth had been in an accident. She and her husband arranged to get the next available flights to Texas, which were not until the next day. They then prayed as a family for Seth. That evening, they received a call that Seth had passed. She and her husband flew to Texas the next day. Seth's employer held a memorial service for Seth in Texas while Jodi and Adam were in town. Jodi and Adam also went to Seth's house to visit with Seth's roommate and to collect some of Seth's belongings.

9

Jodi testified that since Seth's death she has been having a "rough time." She is no longer feeling positive and she finds it hard to work. She explained that she has a hard time keeping her emotions from showing while she works, and that she "fakes it." She has been seeing a doctor for panic attacks that started after her son's passing. She testified that at the time of trial she was still taking medications for panic attacks and to calm her down and help her sleep. She had never been on the medications before Seth's death.

After Seth's passing, to help her cope, Jodi initially began seeing a church counselor, but she also needed to see a psychiatrist. She explained that she knows Seth would want her to "live," so she tries her best. She still speaks regularly to Seth's roommate from Texas. Jodi testified that she and her husband try to do the things they used to, but losing Seth is something they will never get over.

According to Jodi, Seth was financially stable and did not require any assistance from his parents, nor did they rely on Seth to assist in their finances. Jodi testified that there was no money that could replace Seth, but the money would alleviate the stresses associated with having to "fake going to work."

### 2. Testimony of Adam Hidinger

At the time of his testimony, Adam was fifty-two years old. He works as a systems station mechanic for a gas company, working on natural gas compressors and engines. He and Seth were both active outdoors; they enjoyed many activities together such as hunting, fishing, and snowmobiling. Adam and Seth also worked in the garage together. Adam taught Seth how to ride a motorcycle, and they often rode together.

Adam testified that he was very proud of the independence his son showed. Adam recalled talking to Seth about his move to Texas; he stated that Seth approached the transition very maturely and put a lot of consideration into his decision to move. After his move to Texas, Seth communicated with his father weekly, though Seth was in contact more regularly with his mother. Adam enjoyed when Seth would come home to visit and described his relationship with his son as a very good father/son relationship. He was proud of his son and they had a mutual respect for one another.

Adam was in disbelief when he learned of his son's passing. He described it as feeling "blank." Adam and Jodi were able to fly to Texas the morning after the accident, where they retrieved Seth's belongings from the hospital and were able to see their son. Afterwards, there was a memorial service in Seth's honor and Adam was appreciative that Seth had people who cared for him in Texas. There was also a service in Pennsylvania for Seth.

Adam has not seen any doctors to help him through his loss. He testified that he's trying to get through it with the support of his family. He testified that he is trying to live his life as normally as he can after the loss, but that he puts on a "fake smile" for work and cries when he is alone. Adam stated that the loss has caused a change in Jodi where she is shaking and crying in bed at night. After Seth's death, Adam and Jodi both got the same tattoo that Seth had on his back, a compass, "to honor him and hopefully remember him and give us direction." Adam testified that he thinks about his son every day and always will.

3.    **Testimony of Annette Carne**

Annette Carne, wife of Seth's coworker, testified about her relationship with Seth. She testified that one night her husband invited Seth over for dinner and from then on they had a very close relationship. She considered him to be like a son to her. Annette testified that she and Seth were like family, and that she "filled [the] void" for him because he was very close to his mother. Seth was bonded to Annette's whole family and often went to their house for dinner for home-cooked meals.

Annette first met Adam and Jodi when they visited Seth in Texas. Annette felt their families were very similar and bonded well. She said that Seth and Jodi had a very close relationship and Seth talked about the values instilled in him by his parents. After Seth was killed in the accident, Annette testified that when she saw that Jodi was "totally devastated and broken. She was so shattered." She said that Adam was being strong for Jodi, but that it was "a parent's worst nightmare." There was a memorial service held for Seth in Texas. Jodi wanted the service to be "upbeat and cheerful," but Annette testified that Seth's death was a great loss.

### 4. Testimony of Adam Powell

Seth's roommate and coworker Adam Powell also testified. He described Seth as "an old soul." Powell and Seth went snowboarding together, and Seth was the reason Powell got a motorcycle. He testified that Seth "liked to go on adventures" and he went along with him. At the time of the accident, Powell had not yet met Jodi and Adam, but since Seth's death they have maintained a relationship. After Seth's passing, Powell went on a beach trip with Seth's family because prior to the accident, Seth had tried to convince him to go. Powell testified that it was an emotional week with Seth's family. Powell testified that Seth's family was very close, and Seth's death has been very hard on them.

**D.    Non-Pecuniary Damages**

The jury charge defined "loss of companionship and society" as "the loss of positive benefits flowing from the love, comfort, companionship, and society that [the Hidingers], in reasonable probability, would have received from Seth Darrell Hidinger, had he lived." "Mental anguish" was defined as "the emotional pain, torment, and suffering experienced by [the Hidingers] because of the death of Seth Darrell Hidinger." The jurors were instructed that, in determining the non-pecuniary damage awards they "may consider the relationship between Seth Darrell Hidinger and his parents, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities." The charge separated the awards for each parent, allowing the jury to choose individual amounts for Jodi and Adam.

**1.    Jodi Hidinger**

In its non-pecuniary award, the jury awarded Jodi damages in the amount of $1,000,000 for past mental anguish, $250,000 for future mental anguish, $200,000 for loss of society or companionship in the past, and $500,000 for loss of society or companionship in the future. Lawhorn argues that this award is excessive and not supported by the evidence.

Jodi testified as to her loving and close relationship with her son. Jodi and Seth had near daily contact with one another, and Jodi considered Seth to be her best friend. Although mental anguish is distinguishable from loss of companionship and society, in awarding damages for both elements, the jury may consider some of the same factors. *See Thomas*, 290 S.W.3d at 456 (identifying factors to be considered as including relationship between decedent and beneficiary, living arrangements of parties, any

13

extended absence of deceased from beneficiary, harmony of family relations, and parties' common interests and activities). Each witness who testified on behalf of the Hidingers expressed that Jodi and Seth were very close, that Jodi was "devastated" by the loss of her son and finding it hard to live life the way she previously had. Jodi was prescribed Xanax and Lexapro to help her with what she described as a daily struggle to get by. The evidence presented an extremely close relationship, bond, and friendship between Jodi and her son. She testified to the almost daily communications with her son, to her reliance on his advice, and that Seth "was worth everything." Jodi's daily life has been impacted by her need for medications, her inability to perform her work duties as she once had, and the impact of her son's death that she testified will never go away.

Damages for mental anguish are intended to compensate the beneficiary for the deleterious effect that the wrongful death had on the beneficiary. *See Moore*, 722 S.W.2d at 688; *Thomas*, 290 S.W.3d at 455–56. Proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings. *Thomas*, 290 S.W.3d at 455. A physical manifestation of mental anguish is, however, evidence of the extent or nature of the mental anguish suffered. *Moore*, 722 S.W.2d at 686; *see Critical Path Res., Inc. v. Cuevas*, 561 S.W.3d 523, 575 (Tex. App.—Houston [14th Dist.] 2018), *supplemented by* No. 14-16-00036-CV, 2018 WL 2106599 (Tex. App.—Houston [14th Dist.] May 8, 2018, pet. filed).

Here, Jodi expressed in her testimony that she was devastated by her son's loss and that she was suffering daily from her grief and despair. The jury heard evidence of Jodi's panic attacks and need for daily medications since her son's passing to help her

14

cope. We conclude that the evidence presented is sufficient to support the jury's award of non-pecuniary damages to Jodi. *See Cuevas*, 561 S.W.3d at 577 (suggesting a remittitur to $4,000,000 to mother and $3,000,000 to father as an award of non-economic damages to the parents of an adult son killed in a refinery).

### 2. Adam Hidinger

In its non-pecuniary award, the jury also awarded Adam damages in the amount of $1,000,000 for past mental anguish, $250,000 for future mental anguish, $200,000 for loss of society or companionship in the past, and $500,000 for loss of society or companionship in the future. Lawhorn argues that this award is excessive and not supported by the evidence.

Adam testified that he and Seth shared common interests in hunting, fishing, vacationing, motorcycle riding, and other outdoor and hands-on activities. He testified that he and his son would work together on projects and were often in the garage working together. Annette also testified that Adam and Seth were both very hands-on and were both willing to help Annette's husband on their home renovations when Adam and Jodi were visiting. He was very proud of his son and they had a "mutual respect" for each other. Adam explained that he talked to his son often. Adam viewed Seth as very independent and mature. After the loss of his son, Adam finds that it has been a trying experience. Adam's testimony was that his day to day life has been disrupted by the death of his son. While he goes to work, he fakes a happy demeanor to get through his day. He tries to live life as normally as he can, but often cries alone. He admits that he and his wife will "live but not the same."

15

From his own testimony and that of the other witnesses, it was established that Adam and Seth had a close father-son relationship, sharing a mutual respect for each other, a strong family bond, and many common interests and activities. *See Cuevas*, 561 S.W.3d at 575 (citing *Moore*, 722 S.W.2d at 688) ("The considerations for loss of companionship and society include (1) the relationship between the decedent and the beneficiary; (2) the living arrangements of the parties; (3) any extended absence of the decedent from the beneficiary; (4) the harmony of family relations; and (5) the family's common interests and activities."). In a wrongful death case, proof of a familial relationship is some evidence that the surviving family members suffered mental anguish as a result of the death. *Moore*, 722 S.W.2d at 685. In such a case, therefore, it is not necessary for the plaintiff to prove that mental anguish is physically manifested. *Id*. We conclude that the evidence presented is sufficient to support the jury's award of non-pecuniary damages to Adam. *See Cuevas*, 561 S.W.3d at 577; *see also Guzman*, 761 S.W.2d at 511 (stating that the appellate court's duty is to determine if the value found by the jury is so against the evidence, or unsupported by the evidence, so as to be manifestly unjust).

Lawhorn argues that the identical damages awarded to each parent indicates the jury did not give careful consideration to each of the damage elements and therefore supports remittitur. *See Lane,* 494 S.W.3d at 351 ("[I]t appears that the jury in this case did not give careful consideration to each of the damage elements but, rather, picked a number at random and just filled in the blanks."). However, the case before us is distinguishable from *Lane*. In *Lane*, the court of appeals found that the jury chose a total award of damages and divided the total by the number of "blanks" they had to fill on their

16

jury form, ultimately awarding $234,500 in each category for each parent. *Id*. at 347. Here, the jury awarded different amounts in each category of non-pecuniary damages, past and present. While the awards for each parent were the same, the fact that the jury awarded different amounts in each category supports a conclusion that the jury did not randomly award damages in this case. *See id.* at 350. Moreover, although their testimony was different and only Jodi needs medication to cope with panic attacks, the jury witnessed both parents when they testified. The record suggests that both parents emotionally broke down on the witness stand and the jury may have believed that, although their words were different, they suffered similarly from the death of their son.

**E.      Pecuniary Damages**

The jury charge defined "pecuniary loss" as "the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that [the Hidingers], in reasonable probability, would have received from Seth Darrell Hidinger, had he lived." The jury awarded no damages for pecuniary loss sustained in the past but awarded Jodi and Adam each $100,000 for pecuniary loss in the future.

Both Jodi and Adam testified to their son's independent and strong work ethic. The parents were proud of their son's maturity and independence since graduating from high school. Seth lived and worked in Texas at the time of his death and was fully supporting himself. Both Jodi and Adam testified that he had always been able to care for himself. They also testified that they did not rely on their son for support financially.

Appellees argue that the award was justified because Seth offered his parents counsel, supported them emotionally, and gave them advice. Seth also had a good job with a good salary and was very independent and responsible.

17

In awarding pecuniary damages, the jury has many factors they may consider. *See Peek v. Parker*, 210 S.W.2d 619, 620 (Tex. Civ. App.—Fort Worth 1948, no writ) (stating that "the plaintiff is permitted to show the character of the child, his affection and disposition toward his father and mother, his acts of assistance and donations, his earning capacity at the time of his death, his probable future earning capacity, the amount of his property, his age and expectancy, and like matters"). The jurors could apply their knowledge and experience to estimate the value of the services Seth would have rendered his parents, without proof of their value. *Missouri–Kansas–Texas R.R. Co. v. Pierce*, 519 S.W.2d 157, 160 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.); *Arando v. Higgins*, 220 S.W.2d 291, 293 (Tex. Civ. App.—El Paso 1949, writ ref'd n.r.e.). A jury's discretion in doing so is not unlimited, however, and must be based on the evidence adduced. *Pierce*, 519 S.W.2d at 160; *see also Excel Corp. v. McDonald*, 223 S.W.3d 506, 510 (Tex. App.—Amarillo 2006, pet. denied).

Here, Seth did not contribute to his family in a financial way at the time of his death. Jodi testified that her son often gave her advice and she received comfort from her conversations with her son. The testimony portrayed Seth as a respectable and responsible young man, who truly cared for his parents and family. He earned a good living and was capable of caring for himself. However, there was no testimony or evidence presented that Jodi or Adam required Seth's assistance or expected Seth to contribute to their finances in the future. In fact, both parents testified that they did not rely on their son for such contributions. Additionally, there was no evidence of Seth's earnings, his future earning capacity, or any financial contributions Seth would have provided.

18

Having reviewed all of the evidence presented, we hold that the award of $100,000 to each parent is not justified by the evidence presented. When we conclude that part of a damages verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of the part of the award that is not supported by sufficient evidence. TEX. R. APP. P. 46.3 (stating that a court of appeals may suggest remittitur); *Cuevas*, 561 S.W.3d at 577. Therefore, we suggest a full remittitur of the pecuniary damage award.

We sustain Lawhorn's second issue to the extent that it challenges the pecuniary damage awards as excessive.

## IV. CONCLUSION

We have found that the evidence supports the award for non-pecuniary damages. However, regarding pecuniary damages, we have found factually insufficient evidence to support the trial court's award of $100,000 in future pecuniary damages to each of Jodi and Adam. Ordinarily, a damages award based on factually insufficient evidence may be reversed and remanded for a new trial. *See Ames v. Ames*, 776 S.W.2d 154, 158 (Tex. 1989). However, a new trial on future pecuniary damages only would be unfair to the parties. Therefore, we reverse the trial court's judgment in its entirety and remand the cause for a new trial on liability and damages. *See* TEX. R. APP. P. 44.1(b) ("If the error affects part of, but not all, the matter in controversy and that part is separable without unfairness to the parties, the judgment must be reversed and a new trial ordered only as to the part affected by the error. The court may not order a separate trial solely on unliquidated damages if liability is contested.").

We suggest a remittitur of the $100,000 awarded as future pecuniary damages to each of Jodi and Adam. Should Jodi and/or Adam, within twenty days of our judgment,

19

voluntarily remit that amount and notify the Clerk of this Court of such, then the error with respect to future pecuniary damages will be cured, and we will supplement this opinion to affirm the judgment with respect to the remitting party or parties, thereby obviating the need for a new trial. *See* TEX. R. APP. P. 46.5.

NORA L. LONGORIA
Justice

Delivered and filed the
21st day of March, 2019.