**AFFIRMED; Opinion Filed November 30, 2020**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00167-CV

**SARAH GREGORY AND NEW PRIME, INC., Appellants**
**V.**
**JASWINDER CHOHAN, INDIVIDUALLY AND AS NEXT FRIEND AND NATURAL MOTHER OF G.K.D., H.S.D., AND A.D., MINORS, AND AS REPRESENTATIVE OF THE ESTATE OF BHUPINDER SINGH DEOL, DARSHAN SINGH DEOL, JAGTAR KAUR DEOL, GUILLERMO VASQUEZ, WILLIAM VASQUEZ, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF ALMA B. ("BELINDA") VASQUEZ, ALMA J. PERALES, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF HECTOR PERALES AND AS NEXT FRIEND OF MINOR N.P., Appellees**

On Appeal from the County Court at Law No. 5
Dallas County, Texas
Trial Court Cause No. CC-15-02925-E

## EN BANC OPINION
Before the Court En Banc[1]
Opinion by Justice Reichek

Sarah Gregory and New Prime, Inc. appeal a judgment awarding damages to

the Estate of Bhupinder Singh Deol and his wife, children, and parents in connection

---

[1] The Court En Banc consists of the 13 current justices as well as the Honorable Martin Richter, Justice, Court of Appeals, Fifth District of Texas as Dallas, Retired, who sat by assignment on the original panel.

with Deol's death following a multi-vehicle collision on Interstate 40 in Texas.[2] In twelve issues,[3] Gregory and New Prime challenge the sufficiency of the evidence to support various jury findings and assert instances of error in the jury charge and in the striking of designated responsible third parties. For the reasons set out below, we overrule the twelve issues presented and we affirm the trial court's judgment.

## BACKGROUND[4]

This appeal involves a multi-vehicle accident that occurred in the early morning hours of November 23, 2013, on an unlit portion of Interstate 40, after Gregory jackknifed a tractor-trailer she was driving for New Prime. Four people died, and others were injured, as a result of the accident.

The tractor-trailers and the vehicles involved in the accident were traveling east on Interstate 40 near the New Mexico–Texas state line. That portion of Interstate 40 is a four-lane highway, two lanes in each direction, with right and left shoulders, and grassy medians between the east- and west-bound lanes and between the shoulders and service roads.

---

[2] One of the vehicles involved in the collision was a van driven by Guillermo Vasquez. He and several family members, identified herein as the Vasquez/Perales family, were also parties to this suit and the judgment included various damage awards to them. During the pendency of this appeal, Gregory and New Prime settled the Vasquez/Perales family's claims and the Vasquez/Perales family released their judgment. Accordingly, this opinion will address Gregory and New Prime's complaints as they relate to the Deol family only.

[3] Initially, Gregory and New Prime asserted thirteen issues. One of those issues, issue eleven, concerned the Vasquez/Perales family only. Because Gregory and New Prime have settled the Vasquez/Perales family's claims, we do not consider that issue. TEX. R. APP. P. 47.1.

[4] Justice Schenck was the original author of this opinion. The background facts and portions of the analysis in this en banc opinion were adapted from his original opinion.

As Gregory drove the New Prime tractor-trailer east on Interstate 40, she saw the brake lights of two passenger vehicles one-half mile to one mile ahead. She applied the brakes in a firm fashion and the truck slid on a patch of ice. Gregory lost control, and the tractor-trailer jackknifed across the roadway. When it finally came to rest, the cab was partially on the left shoulder with the trailer at an angle, blocking all of the left lane and half of the right lane of traffic. Gregory abandoned the truck without activating its emergency flashers or setting out any reflective triangles or flares despite instructions to do so contained in an "Accident Checklist" in the cab. She returned to the truck when she realized her co-driver, 22-year-old Aaron Ellison, was in the cab's sleeping berth.[5] Gregory roused Ellison, and together they walked through the center median toward the westbound traffic to get to a safe area.

Soon afterwards, six tractor-trailers and two passenger vehicles crashed into or around the New Prime truck, the first being a Maryland Trucking Company tractor-trailer driven by Deol. Deol managed to maneuver his truck around the New Prime truck, but was clipped on the right rear side by a Danfreight Systems' tractor-trailer. Deol stopped his tractor-trailer on the right shoulder and the Danfreight System's tractor-trailer stopped in the grassy area between the right shoulder and the service road.

---

[5] New Prime hired Gregory approximately three months prior to the accident at issue in this case. After some training, she obtained a commercial driver's license. She spent several more weeks driving tractor-trailers under the oversight of certified instructors. At the time of the accident, Gregory was classified as a B1 driver, meaning she had to be paired with a certified instructor or an experienced driver. There was evidence adduced at trial that Ellison was only marginally more experienced than Gregory.

An ATG Transportation tractor-trailer then arrived. Its driver steered hard to the right to avoid the New Prime truck, overturning in the process so that the cab was on the grassy area beyond the right shoulder and the back of the trailer protruded onto the right shoulder. At that point, the accident scene appeared as follows with the New Prime tractor-trailer jackknifed, the ATG Transportation tractor-trailer on its side, the Maryland tractor-trailer on the right shoulder, and the Danfreight tractor-trailer ahead on the right grassy median.[6]

---

[6] The accident scene depictions in this opinion are extracted from exhibits admitted at trial.



Moments later, Guillermo Vasquez, his wife Belinda, their adult son William, their adult daughter Alma Perales, Alma's husband Hector Perales, and one of the Perales' sons approached the accident scene in their Chevy van. They were traveling at approximately 30 miles per hour. As Vasquez approached the accident site, he took his foot off the pedal and steered left. The van slid and hit the New Prime truck at approximately 10 miles per hour. No one was injured in that collision. Shortly thereafter, a silver Prius going more than 70 miles per hour came upon the scene. It collided with the rear of the ATG trailer and remained on the right shoulder. Three of the Prius passengers had time to get out of the car and were attempting to extract the fourth. While they were doing so, a P&O Transportation tractor-trailer, driven by Orland Ferrer, arrived on the scene. Ferrer saw the Prius and steered left in an effort to avoid it. At that point, he saw the unlit New Prime trailer jackknifed across the road, but he could not brake quickly enough on the icy road to avoid striking the Vasquezes' van that was stopped in front of it.

After colliding with the Vasquezes' van, the P&O truck itself was then struck by two other tractor-trailers, one belonging to D.O.D. Reynolds and the other to CDO Express Diversified. All three of the tractor-trailers ended up in the center median. The final accident scene appeared as follows with the New Prime truck on the left shoulder and center median, the Prius and Vasquez van near the Maryland truck, and the Reynolds, P&O, and CDO Express trucks on the center median.



When state troopers arrived at the scene, they discovered multiple people had been killed or seriously injured, including Deol who was lying on the roadway. Accident reconstruction experts concluded that when the P&O truck struck the Vasquez van, it caused the van to roll and run over Deol, killing him.

Deol's wife, Jaswinder Chohan, individually and on behalf of her and Deol's three children, together with Deol's estate and Deol's parents, who lived with Deol's family, sued Gregory, New Prime, and others for negligence. In addition to claiming New Prime was vicariously liable for Gregory's negligence, the Deol family asserted direct claims of negligence against New Prime for negligent entrustment, supervision, and training. The Deol family settled their claims against all of the defendants other than Gregory and New Prime.

Before trial, Gregory and New Prime designated P&O Transport, ATG Transportation, Danfreight Systems, and their respective drivers as responsible third parties. The Deol family moved to strike these designations, and the trial court granted the motion. The court stated it would reconsider its ruling before submitting the case to the jury.

At trial, Gregory and New Prime requested that the trial court instruct the jury on the concepts of sudden emergency, unavoidable accident, and new and independent cause. The trial court granted Gregory and New Prime's request as to the sudden emergency instruction, but denied their request as to the unavoidable-accident and new-and-independent cause instructions. Ultimately, the trial court

–8–

asked the jury to decide whether the negligence of Gregory, New Prime, the P&O driver, and Deol proximately caused Deol's death. The trial court did not ask the jury to consider any negligence on the part of ATG Transportation or Danfreight Systems. The jury answered affirmatively as to causation with respect to Gregory, New Prime, and the P&O driver, and negatively as to Deol himself. The jury apportioned responsibility for Deol's death as follows: fifty-five percent to Gregory, thirty percent to New Prime, and fifteen percent to the P&O driver.

The jury awarded almost $17 million in economic and non-economic damages to the estate and family of Deol, including $500,000 for Deol's pain and mental anguish. The trial court entered a final judgment stating, in part, the following:

> At trial it was undisputed that Defendant Sarah Gregory was an employee of Defendant New Prime, Inc. d/b/a Prime, Inc., operating within the course and scope of her employment at the time of the accident. Therefore, Defendant New Prime, Inc. d/b/a Prime, Inc. is vicariously liable for the negligence of Defendant Sarah Gregory and her percentage of responsibility is attributed to Defendant New Prime, Inc. d/b/a Prime, Inc.

The judgment awarded the Deol family "actual damages in the sum of sixteen million four hundred forty-seven thousand two hundred seventy-two dollars and thirty-one cents ($16,447,272.31), reflecting settlement credits of four hundred seventy-eight thousand eight hundred thirty dollars and no cents ($478,830.00), from Defendants Sarah Gregory and New Prime, Inc. d/b/a Prime, Inc., which are jointly and severally liable for the entire amount of such sum." Gregory and New Prime then brought this appeal.

**DISCUSSION**

I.     <u>Sufficiency of the Evidence – Negligence</u>

In their first issue, Gregory and New Prime assert the evidence is legally and factually insufficient to prove Gregory was negligent. Gregory and New Prime's legal sufficiency challenge requires us to view the evidence "in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). The evidence is legally sufficient if "more than a scintilla of evidence exists." *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Litton Loan Servicing, L.P. v. Manning*, 366 S.W.3d 837, 840 (Tex. App.—Dallas 2012, pet. denied). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010). In reviewing Gregory and New Prime's factual-sufficiency challenge, we "consider and weigh all the evidence, and we should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Negligence means a failure to use ordinary care, which is failing to behave as a person of ordinary prudence would have under the same or similar circumstances.

*Union Pac. R.R. Co. v. Nami*, 498 S.W.3d 890, 896 (Tex. 2016). We conclude the testimony presented at trial from Gregory, Ellison, New Prime's safety supervisor, the P&O driver, a meteorologist, a motor carrier expert, an accident reconstructionist, and others is legally and factually sufficient to establish Gregory was negligent in multiple ways.

The evidence showed this fatal trip began with Gregory and her 22-year-old teammate, Ellison, driving to California to drop off cargo and pick up a load of beer to deliver to North Carolina. Gregory relieved Ellison as driver in Santa Rosa, New Mexico. She had to backtrack several hours in the opposite direction to a casino in Sky City, New Mexico, because Ellison had left his wallet there. Gregory then encountered snow on the way back to Santa Rosa. She experienced problems with the windshield-wiper fluid, causing difficulty seeing out the windshield because of freezing ice. She stopped in Moriarty, New Mexico, to have the problem fixed and then proceeded to travel east toward Amarillo, Texas.

Gregory checked the weather while in Moriarty but did not make any effort to obtain updates thereafter. The National Weather Service issued a winter weather advisory covering the relevant time and area, warning of snow, sleet, or freezing rain that could create slippery roads. The temperature was 23 degrees, and there was light freezing drizzle and sleet. The freezing and icy conditions extended west all

–11–

the way to the state line.[7]  Despite the weather conditions and running behind schedule, Gregory approached the accident site with the truck's cruise control set at 58 miles per hour.  Experts testified cruise control should not be used when there is precipitation or indications of ice.  Gregory acknowledged, and others confirmed, that, if it was precipitating, her speed was in violation of the applicable standard of care, that is to say, not a speed at which a person of ordinary prudence would travel.

Gregory testified she lost control of the New Prime truck when she applied a "hard stop" and hit a patch of ice.  The jury heard from a safety expert who testified a prudent driver would not apply maximum braking pressure under the conditions Gregory faced.[8]  One of the other truck drivers involved in the accident testified that, when attempting to stop or slow down, drivers should stab the brake, then let up, stab again, then let up again, because holding the brakes down locks everything up causing the driver to lose control of the vehicle.  Significantly, Gregory admitted that, in losing control of the rig, she failed to meet the standard of care required in operating a tractor-trailer.  Accordingly, in addition to establishing Gregory failed to recognize adverse weather conditions and drove at an unsafe speed, the evidence

---

[7] Three years after the accident, some of the witnesses did not recall inclement weather at the time of the accident.  The jury was free to weigh their testimony against that of the meteorologist and the fact that the evidence showed Gregory encountered ice at the time of the accident.  *Leibovitz v. Sequoia Real Estate Holdings, L.P.*, 465 S.W.3d 331, 351 (Tex. App.—Dallas 2015, no pet.) (factfinder is sole judge of credibility and weight to be given testimony).

[8] The expert explained that because there is a tractor and a separate trailer, coupled with a fifth wheel, there is a brake lag, which means there is roughly a half-second delay between when the driver of the tractor applies the brakes and when the brakes are actually applied throughout the entire vehicle.

supported a finding that Gregory was negligent in braking in a manner that caused the trailer to jackknife upon encountering ice on the roadway.

The evidence regarding negligence addressed not only Gregory's actions resulting in her truck blocking the roadway, but also her actions after her truck became disabled that were material to creating the resulting pile up. If a parked or disabled vehicle obstructs the road, the operator of the vehicle must act with reasonable promptness to warn other motorists of the vehicle's presence and to remove the vehicle from the road. *Lofton v. Norman*, 508 S.W.2d 915, 919 (Tex. App.—Corpus Christi–Edinburg 1974, writ ref'd n.r.e.); *McClellan v. Lee*, 426 S.W.2d 635, 638 (Tex. App.—Houston [1st Dist.] 1968, no writ). Gregory did neither. She failed to activate the truck's emergency warning flashers, failed to set out reflective triangles or flares, and abandoned her truck in its jackknifed condition on the dark, icy highway blocking most of the eastbound lanes even though she knew that oncoming motorists would have to "fend for themselves, with respect to the hazard [she] created." Gregory acknowledged that by abandoning the truck she violated the standard of care that New Prime wanted her to follow.

Gregory and New Prime contend evidence that the other tractor-trailer drivers who were involved in the accident did not activate any warning systems shows she did not violate the standard of care. Many of the other tractor-trailers, however, managed to clear the roadway and were stopped in a way that did not create a hazard to oncoming traffic. More importantly, the standard of care is determined

–13–

objectively by what a person of ordinary prudence would have done under the same or similar circumstances. *See 20801, Inc. v. Parker*, 249 S.W.3d 392, 398 (Tex. 2008). Accordingly, the conduct of the other drivers does not conclusively establish that Gregory did not violate the objective standard of care. Finally, while the evidence showed Gregory had time to exit her truck, walk away, return to retrieve Ellison, and then again walk to safety, the record does not show that the drivers whose vehicles came upon the scene later and were forced to stop in a manner that blocked the road had the same amount of time to activate a warning system before the fatal events occurred.

Gregory attempts to rely on the defense of sudden emergency. The sudden-emergency doctrine applies only if the sudden emergency was not proximately caused by any negligence of the defendant and, after the emergency arises, the defendant acts as a person of ordinary prudence would have acted under the same or similar circumstances. *Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 432 n.4 (Tex. 2005). As noted above, the evidence established Gregory's actions before and after her tractor-trailer encountered ice on the roadway were negligent because she failed to recheck the weather, drove with the cruise control activated at an unsafe speed, applied a hard stop as her truck hit the ice, and then failed to warn oncoming traffic of the hazard she created when a reasonably prudent person would have done so. Accordingly, the jury had more than sufficient evidence to reject Gregory and New Prime's sudden-emergency defense.

Considering and weighing all of the evidence in the record pertinent to the finding of negligence, we determine that there is more than a scintilla of competent evidence to support the jury's finding, and the finding is not contrary to the overwhelming weight of all the evidence as to be clearly wrong and unjust. Accordingly, we conclude the evidence is legally and factually sufficient to support the jury's finding Gregory was negligent.

II.     Sufficiency of the Evidence – Proximate Cause

In their fourth issue, Gregory and New Prime also contend the evidence is legally and factually insufficient to support the jury's finding that Gregory's conduct proximately caused Deol's death. Proximate cause has two sub-elements, cause-in-fact and foreseeability. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). Negligence is a cause-in-fact of an injury if (1) the injury would not have occurred without the negligence and (2) the negligence is a substantial factor in causing the injury. *Miller v. Lone Star HMA, L.P.*, No. 05-17-00954-CV, 2018 WL 3991191, at *2 (Tex. App.—Dallas Aug. 21, 2018, pet. denied) (mem. op.). Foreseeability requires that the negligent actor, as a person of ordinary intelligence, anticipate, or should have anticipated, the danger their negligence created for others. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549–50 (Tex. 1985).

To proximately cause an injury, an actor need not be the last cause, nor commit the act immediately preceding the injury. *J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 663 (Tex. App.—Fort Worth 1999, pet. denied) (citing *Tex. Power*

–15–

*& Light Co. v. Stone*, 84 S.W.2d 738, 740 (Tex. App.—Eastland 1935, writ ref'd)). Moreover, there can be more than one proximate cause of an accident. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). When the new cause or agency concurs with the continuing and co-operating original negligence in working the injury, the original negligence remains a proximate cause of the injury, and the fact that the new concurring cause or agency may not have been reasonably foreseeable should not relieve the wrongdoer of liability. *Bell v. Campbell*, 434 S.W.2d 117, 122 (Tex. 1968). Thus, it is no defense that a third person's negligent act intervened to cause the injury to the plaintiff if the new act cooperates with the still-persisting original negligence of the defendant to bring about the injury. *See Rodriguez v. Moerbe*, 963 S.W.2d 808, 819 (Tex. App.—San Antonio 1998, pet. denied).

Gregory and New Prime claim Gregory's negligence was not a cause-in-fact of the collision that killed Deol because the initial accident had come to a rest and intervening conduct became the proximate cause of Deol's death. Gregory and New Prime also argue that Gregory merely created a condition in which the accident occurred and thus Gregory's actions were not a proximate cause under controlling Texas law.

In support of their contention that the accident had run its course at the time Deol was struck and killed by the Vasquez van, Gregory and New Prime rely on *Bell v. Campbell*. In *Bell*, a vehicle pulling a trailer on a highway rear-ended another vehicle. *Bell*, 434 S.W.2d at 119. During the accident, the trailer broke off and came

–16–

to rest on the highway. *Id.* Passers-by then stopped to help move the trailer to the side of the road. *Id.* As they were doing so, they were struck by another automobile, the driver of which had ignored or failed to see a person flashing a warning signal. *Id.* The estates of two of the passers-by sued the owner of the trailer for negligence. On appeal, the Texas Supreme Court agreed with the determination by the jury that the negligence of the owner of the trailer did not constitute legal causation. The court stated "[t]he active and immediate cause of the second collision . . . was an entirely independent agency . . . . All forces involved in or generated by the first collision had come to rest, and no one was in any real or apparent danger therefrom." *Id.* at 120. The court further held that the defendant's negligence "did not actively contribute in any way to the injuries . . . . It simply created a condition which attracted [plaintiffs] to the scene . . ." *Id.* at 122.

We observe that while the facts in *Bell* and this case are similar in part, there are critical differences. The record before us establishes Gregory's negligence did not merely create a condition which "attracted" Deol to the scene. Rather, Gregory's negligence caused Deol to take evasive action and then have his truck struck by another tractor-trailer. He was in the zone of danger created by Gregory and that persisted unabated thereafter because of her failure to signal any warning. Thus, unlike the warning provided in *Bell* before the second driver hit the good Samaritans, here there was no warning before the P&O driver approached the scene colliding with the Vasquez van and pushing it into Deol, causing his death. The jury in this

–17–

case could readily conclude that the potential danger created by Gregory's negligence in jackknifing the trailer and in failing to warn oncoming traffic, continued and remained active. Her actions and failure to act continued to create a danger to which those already involved in the accident and those that encountered the scene were exposed. Thus, Gregory's negligence "actively contributed" to Deol's peril in the critical time frame.

Gregory and New Prime also rely on *Union Pump v. Allbritton,* 898 S.W.2d 773 (Tex. 1995). That case involved a fire at a Texaco facility, which had been caused by a machine manufactured by Union Pump. *Id.* at 774. Allbritton, a Texaco employee, assisted in extinguishing the fire. When leaving the scene, Allbritton walked over a pipe rack which was wet with water or foam. *Id.* She slipped on the rack and injured herself. *Id.* Allbritton stated the route she took over the pipes was the shorter route but not the safer route. *Id.* Allbritton admitted she chose the less-safe route because she had a "bad habit" of doing so. *Id.* Relying on the above-quoted language in *Bell,* the court held that the negligence of Union Pump was too remote to constitute proximate cause of Allbritton's injury. *Id.* at 776.

Again, the facts of *Union Pump* are materially different from those presented here in that the plaintiff in *Union Pump* was not injured by the danger created by the defendant's negligence because that danger had ceased to exist. In contrast, Gregory's negligence in jackknifing the trailer and in failing to warn oncoming traffic created an active danger that continued to exist and contributed to Deol's

–18–

death. We further note there are several cases factually similar to this case from this Court and other courts of appeals that likewise distinguish *Bell*, *Union Pump*, or both. *See, e.g., In re Molina*, 575 S.W.3d 76, 82 (Tex. App.—Dallas 2019, orig. proceeding) (driver's conduct in darting across roadway did not merely furnish condition that made accident possible, it forced another driver to slow down, which in turn caused collision); *Westfreight Sys., Inc. v. Heuston*, No. 04-14-00124-CV, 2015 WL 3772397, at \*4 (Tex. App.—San Antonio June 17, 2015, pet. denied) (mem. op.) (driver's initial negligence in backing 18-wheeler across darkened highway continued to pose danger even after he began moving truck forward); *Homeland Express, L.L.C. v. Seale*, 420 S.W.3d 145, 150–51 (Tex. App.—El Paso 2012, no pet.) (driver's negligence in parking 18-wheeler on part of lane of travel and failing to set out warning devices was proximate cause of collision that occurred thereafter; dangerous situation caused by parking 18-wheeler never abated and forces generated by driver's conduct had not come to rest at time of collision); *Longoria v. Graham*, 44 S.W.3d 671, 676 & n.6 (Tex. App.—Houston [14th Dist. 2001, no pet.) (rejecting argument that plaintiff should have stayed in car instead of exhibiting good Samaritan conduct); *Peeples*, 985 S.W.2d at 664 (holding that by negligently causing his truck to become disabled on interstate highway and block traffic, defendant was legal cause of subsequent collision; evidence "clearly" established that defendant's negligence and effects thereof, *i.e.,* traffic backup, had not come to rest); *J.D. Abrams, Inc. v. McIver*, 966 S.W.2d 87, 94 (Tex. App.—

Houston [1st Dist.] 1998, pet. denied) (defendant highway contractor negligently restricted lanes of traffic, creating slowdowns or stoppages, and causing rear-end collisions; held that effects of its negligence, though negligence apparently had been committed hours earlier, had not ended and caused accident in much more direct sequence than in *Bell* and *Union Pump*); *Almaraz v. Burke*, 827 S.W.2d 80, 82 (Tex. App.—Fort Worth 1992, writ denied) (defendant negligently lost control of vehicle, leaving it sideways and disabled in overpass; distinguishing *Bell,* court held defendant was a proximate cause of second collision, which occurred ten minutes after first, because defendant could reasonably foresee his wrecked vehicle causing subsequent collision before preventative action could be taken).

We believe the cited cases from our Court and sister courts of appeals are materially on point and are faithful to the guiding principles of law provided by the supreme court that the negligence must be a substantial factor in bringing about the plaintiff's harm. "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable [people] to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility . . . ." *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991) (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. 1 (1965)).

We conclude, based on the evidence presented at trial, the jury could have reasonably concluded that Gregory's initial negligence in jackknifing the trailer and

abandoning the vehicle on a dark, icy highway without warning to oncoming traffic, continued to pose a danger to all motorists who approached the scene thereafter and until the injuries at issue here occurred. All forces involved in or generated by Gregory's actions had not come to a rest, and others were still in real danger therefrom.

### III. Apportionment of Liability

In their second issue, Gregory and New Prime urge that the apportionment of only fifteen percent responsibility to the P&O driver is against the great weight and preponderance of the evidence. They contend that the finding ignores the fact that no one was hurt until the P&O truck arrived on the scene.

The jury is given wide latitude in performing its duty to serve as factfinder in allocating responsibility for an accident pursuant to section 33.003 of the Texas Civil Practice and Remedies Code. *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 659 (Tex. App.—Dallas 2002, pet. denied). Even if the evidence could support a different percentage allocation of responsibility, an appellate court may not substitute its judgment for that of the jury so long as there was evidence before the jury that can rationally support its conclusions. *Samco Props., Inc. v. Cheatham*, 977 S.W.2d 469, 478 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

The jury in this case heard evidence over the course of a three-week trial that Gregory lost control of the tractor-trailer she was driving after hard-braking on ice

–21–

which resulted in the truck jackknifing.  Gregory then abandoned the truck on the highway, leaving it blocking most of both lanes of travel on a dark evening without activating or setting out any warning system or device.  By the time the P&O truck arrived on the scene, the ATG Transportation truck and the truck driven by Deol were on the right-side shoulder and grassy area because of the hazard created by Gregory's abandoned vehicle.  Because Gregory failed to activate any warning system, the P&O driver did not see the New Prime trailer until he was nearly upon it.  The accident reconstructionist testified none of the collisions, including the P&O truck's collision with the Vasquez van, would have occurred if Gregory's trailer had not been blocking the roadway.  Based upon this evidence, we cannot find reversible error in the jury's allocation of only fifteen percent of the responsibility to P&O.

IV.   Responsible Third Parties

In their third issue, Gregory and New Prime contend the trial court erred in striking their designation of ATG Transportation and Danfreight Systems as potentially responsible third parties.  Texas law allows a tort defendant to designate a person as a "responsible third party."  TEX. CIV. PRAC. & REM. CODE §33.004(a).  The designation's purpose is to have facts relating to that third party submitted to the trier of fact as a possible cause of, or contributing factor to, the claimant's alleged injury.  *See id.* § 33.003.  This may reduce the percentage of responsibility attributed to the defendant, thus ultimately reducing its liability to the claimant.  *Id.* § 33.013.

–22–

Once a responsible third party has been designated, and after an adequate time for discovery has passed, a party may move to strike the designation "on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage." *Id.* § 33.004(*l*); *In re Yamaha Golf-Car Co.*, No. 05-19-00292-CV, 2019 WL 1512578, at *1 (Tex. App.—Dallas Apr. 8, 2019, orig. proceeding) (mem. op.). When confronted with a motion to strike, a defendant must produce sufficient evidence to raise a genuine issue of fact regarding the designated person's responsibility for the claimant's injury. *In re Yamaha*, 2019 WL 1512578, at *1. A trial court may not submit a question to the jury regarding the conduct of any person without sufficient evidence to support the submission. *Id.* § 33.003(b).

A party has produced sufficient evidence to support submission of a question to the jury when it provides more than a scintilla of evidence of potential responsibility for the claimed injury. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992) (citing *Roy v. Howard-Glendale Funeral Home*, 820 S.W.2d 844, 846 (Tex. App.—Houston [1st Dist.] 1991, writ denied)). This occurs when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions" concerning a party's responsibility for an injury. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). A party has produced less than a scintilla of evidence "when the evidence is 'so weak as to do no more than create a

mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

The trial court's ruling on a motion to strike presents a legal question. *Ham v. Equity Residential Prop. Mgmt. Servs., Corp.*, 315 S.W.3d 627, 631 (Tex. App.—Dallas 2010, pet. denied). Thus, our review is de novo. *Molina*, 575 S.W.3d at 80.

The Deol family moved to strike Gregory and New Prime's designation of ATG Transportation and Danfreight Systems, arguing there was no evidence these parties proximately caused the death of Deol. When presenting evidence to a court to defeat a motion to strike a designation of a responsible third party, a party must specifically identify the supporting proof on file that it seeks to have considered by the trial court. *In re Transit Mix Concrete & Materials Co.*, No. 12-13-00364-CV, 2014 WL 1922724, at *5 (Tex. App.—Tyler May 14, 2014, orig. proceeding) (mem. op.). Neither this Court nor the trial court is required to wade through a voluminous record to marshal a party's proof. *Id.*

First, Gregory and New Prime argue that, because the evidence established Guillermo Vasquez and the P&O truck moved to the left to avoid colliding with the ATG Transportation truck that had come to rest on the right grassy median, they fulfilled their obligation to raise a genuine fact issue as to the cause of Deol's death. We disagree.

The evidence established the Vasquez van was traveling at a low rate of speed when it approached the accident site. Because Gregory did not activate a warning

–24–

signal, Guillermo Vasquez had no notice of the presence of that truck until he came upon it in the dark. The evidence showed that, but for Gregory's vehicle blocking the road with no hazard warning signal, Vasquez would have had ample space and time to stop his vehicle and get off the road, notwithstanding the location of the ATG Transportation truck. Because it was due to Gregory's actions that the Vasquez van was placed in the position it was before being pushed over Deol, the evidence is insufficient to establish that any act or omission by ATG Transportation was a substantial factor in causing Deol's death. Consequently, the trial court did not err in striking Gregory and New Prime's designation of ATG Transportation as a responsible third party.

As to Danfreight Systems, Gregory and New Prime contend that because (1) the police report indicated the Danfreight truck took evasive action and struck the Maryland truck after the Maryland truck, driven by Deol, began to slow down, (2) Gregory and New Prime's accident reconstructionist opined that the left side of the Danfreight trailer collided with the right rear corner of the Maryland trailer, and (3) the evidence established Deol exited his truck, there is some evidence Deol "might" not have exited his truck and been run over by the Vasquez van, if his truck had not been hit by the Danfreight truck. This claimed evidence is so weak as to do no more than create a mere surmise or suspicion. In fact, the evidence showed Deol exited his truck to check on other people who were involved in collisions caused by

Gregory's conduct, not because his vehicle was struck.[9] Accordingly, Gregory and New Prime did not produce sufficient evidence to support a finding that an act or omission of Danfreight Systems caused Deol's death. Consequently, the trial court did not err in striking Gregory and New Prime's designation of Danfreight Systems as a responsible third party.

V.     Jury Instruction

In their fifth issue, Gregory and New Prime urge that, although the trial court instructed the jury on sudden emergency,[10] it improperly refused to instruct the jury on the doctrine of unavoidable accident. A trial court has considerable discretion to determine proper jury instructions, and we review a trial court's decision to submit or refuse a particular instruction for an abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012).

Unavoidable accident is an inferential rebuttal defense. *Dillard*, 157 S.W.3d at 432. The purpose of the unavoidable-accident instruction is to advise the jurors that "they do not have to place blame on a party to the suit if the evidence shows that

---

[9] Gregory and New Prime did not object to testimony from witnesses stating they had been told Deol exited his vehicle to check on others.

[10] The trial court instructed the jury on sudden emergency as follows:

> If a person is confronted by an "emergency" arising suddenly and unexpectedly, which was not proximately caused by any negligence on his or her part and which, to a reasonable person, requires immediate action without time for deliberation, his or her conduct in such an emergency is not negligence or failure to use ordinary care if, after such emergency arises, he or she acts as a person of ordinary prudence would have acted under the same or similar circumstances.

conditions beyond the party's control caused the accident." *Id.* (citing *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995)). An unavoidable accident is "an event not proximately caused by the negligence of any party to it." *Reinhart*, 906 S.W.2d at 472. An instruction on unavoidable accident is "most often used to inquire about the causal effect of some physical condition or circumstance such as fog, snow, sleet, wet or slick pavement, or obstruction of view, or to resolve a case involving a very young child who is legally incapable of negligence." *Id.* The doctrine of sudden emergency is subsumed by the broader doctrine of unavoidable accident. *Id.* at 474. Thus, the trial court would have been required to submit an unavoidable accident instruction only if the evidence showed the existence of an unavoidable accident that was not a sudden emergency. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009).

During deliberations, the jury sent a note asking "Does a degre[e of] negligence or external factor not represented as a cause that contributed in question 2 get taken into account in determining losses?" Gregory and New Prime argue this note suggests the jury wanted to factor black ice into its deliberations. Question 2 concerned the apportionment of responsibility of those found negligent in causing the deaths of Belinda Vasquez and Hector Perales and the injuries to the Vasquez and Perales parties. The jury's inquiry was not tied to a negligence and proximate cause question.

Gregory and New Prime acknowledge that their primary line of defense was their contention that black ice caused Gregory and others to lose control of their vehicles. On appeal, Gregory and New Prime claim the sudden-emergency instruction extended only to Gregory's failure to take action once she was stopped and facing traffic and did not cover their assertion that Gregory jackknifed the trailer because of black ice. But Gregory and New Prime's contention fails to recognize that an unavoidable-accident instruction is proper only when there is evidence that the event was not proximately caused by the negligence of any party to the event. *Hill v. Winn Dixie Tex., Inc.*, 849 S.W.2d 802, 803 (Tex. 1992). It is not error to refuse or fail to give an unavoidable-accident instruction where the evidence shows the accident was in fact avoidable in the exercise of due care. *See* W. W. Allen, Annotation, *Instructions on unavoidable accident, or the like, in motor vehicle cases*, 65 A.L.R.2d 12 (1959).

We conclude that the evidence in this case does not raise the issue of unavoidable accident. While Gregory may have encountered ice on the roadway, the evidence established she was negligent before she encountered the ice. More particularly, the evidence established she failed to safely operate her vehicle based on conditions that existed at the time of the accident, she was traveling at a speed

that was excessive under the circumstances,[11] she had the cruise control activated when it was not appropriate to do so, and she hard-braked on the ice when she should not have done so. The safety expert testified commercial drivers are expected to understand the concept of black ice and to check the weather and avoid excessive speed and reliance on cruise control because of the risks it poses.

Had Gregory checked the weather, maintained a proper speed, not activated the cruise control, and not hard-braked, she could have avoided losing control of her vehicle. Because Gregory did not take adequate precautions, she was precluded from relying on "unavoidable accident" as a defense. *See Hyatt Cheek Builders-Eng's Co. v. Bd. of Regents of Univ. of Tex. Sys.*, 607 S.W.2d 258, 266–67 (Tex. App.—Texarkana 1980, writ dism'd) (trial court did not err in refusing to submit instruction on unavoidable accident because reasonably prudent contractor should have foreseen soil movement that led to pipe break); *Otis Elevator Co. v. Shows*, 822 S.W.2d 59, 63 (Tex. App.—Houston [1st Dist.] 1991, writ denied) ("An 'unavoidable accident' is one that ordinary care and diligence could not have prevented, or one which could not have been foreseen or prevented by the exercise of reasonable precautions."). Consequently, the evidence presented did not compel the trial court to submit the question of whether a non-human factor proximately

---

[11] The safety expert testified that truck drivers are to reduce their speed when adverse conditions exist. The speed should be reduced one-third below the posted speed limit in rainy conditions, one-half the posted speed limit in snowy conditions, and to a crawl in icy conditions.

caused the accident. In all events, an unavoidable-accident instruction would not have impacted or exonerated Gregory's failure to activate the emergency flashers or set out warning devices after she allowed the trailer to jackknife, another basis upon which the jury was entitled to find negligence. Accordingly, we conclude the trial court did not abuse its discretion in refusing to instruct the jury on unavoidable accident.

## VI.    New Prime's Liability

The sixth, seventh, eighth, and ninth issues, concern the jury's findings on the Deol family's claims against New Prime for alleged negligent entrustment, supervision, and training. More particularly, New Prime contends there is no evidence of negligent entrustment and the trial court abused its discretion in instructing the jury it could find New Prime liable if it found it negligently supervised Gregory or negligently trained Gregory. In addition, New Prime argues the trial court erred in submitting the negligent entrustment and the defective negligent supervision and negligent training claims without giving a separate blank for each in the liability and apportionment questions, thereby making it impossible to know on what claim the jury found New Prime liable, thereby violating *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000).

In addition to asserting New Prime was negligent in entrusting a commercial vehicle to Gregory and in its supervision and training of her, the Deol family claimed New Prime was vicariously liable for Gregory's actions. Under common law, an

employer is generally liable for the tort of its employee "when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007) (internal quotation omitted). As stated in the trial court's judgment, it was undisputed at trial that Gregory was an employee of New Prime acting within the scope of her employment when the collisions occurred. Indeed, in their proposed jury charge, Gregory and New Prime stated:

> Since NEW PRIME has admitted that its driver was in the course and scope of her employment at the time of the alleged accident and is thus vicariously liable for her negligence, if any, Plaintiffs' claims against NEW PRIME for respondeat superior and their direct negligence claims for negligent training, supervision, entrustment, and other alleged acts or omissions on the part of NEW PRIME have been rendered moot.[12]

Consequently, New Prime is jointly and severally liable with Gregory for the damages awarded to the Deol family. *See Pierre v. Swearingen*, 331 S.W.3d 150, 154–55 (Tex. App.—Dallas 2011, no pet.) (employer's vicarious liability derivative of and commensurate with that of employee).

The trial court rendered judgment against New Prime as jointly and severally liable with Gregory for the entire amount of the judgment based on the company's

---

[12] Because New Prime stipulated that Gregory was acting within the course and scope of her employment, a vicarious liability question was not necessary. *Cf. Diamond Offshore Mgmt. v. Gudry*, 171 S.W.3d 840, 844 (Tex. 2005) (holding where evidence did not conclusively show employee was acting within scope of employment, instruction or question submitting issue to jury is prerequisite to imposition of vicarious liability).

vicarious liability for Gregory's actions, not on the jury's finding concerning the company's direct negligence for entrusting a commercial vehicle to Gregory and in supervising and training her. Because we have already concluded Gregory was properly found liable for negligence, and New Prime's liability is commensurate with Gregory's, it is unnecessary for us to address the alternative bases upon which the jury found New Prime liable.

VII. Pain and Mental Anguish

In their tenth issue, Gregory and New Prime claim no evidence supports a conclusion that Deol experienced conscious pain and suffering in connection with his death. The standard of review for legal sufficiency challenges is set forth earlier in our discussion of Gregory and New Prime's first issue. We need not address Gregory and New Prime's assertion that the Deol family's expert on pain and suffering's testimony was not reliable because other evidence, including eyewitness Ondre Reynolds's testimony, supports the jury's decision to compensate Deol's estate for his pain and mental anguish.

In Texas, a party may recover damages only for pain that is consciously suffered and experienced by the deceased. *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 248 (Tex. App.—Texarkana 2005, no pet.). The presence or absence of physical pain is an inherently subjective question. *Id.* We may infer pain and suffering from proof that the deceased had severe injuries. *Id.* In addition, pain and suffering may be established by circumstantial evidence. *Id.*

The evidence established Deol died of massive blunt force trauma injuries. His head and chest were flattened when the Vasquez van ran over him. Reynolds, the driver of another tractor-trailer, testified that he saw Deol lying in the road. He described Deol as being in "agonizing pain" and "convulsing." Reynolds stated, "He was, like, shaking and stuff. Like in pain. He was in pain . . . . He was just rolling around in pain." Reynolds also stated he saw Deol moving and heard him say "Oh," indicating consciousness. Reynolds's testimony, together with the evidence concerning the traumatic injuries Deol sustained, is more than a scintilla of competent evidence to support the jury's finding Deol experienced conscious pain and suffering. We overrule Gregory and New Prime's tenth issue.

VIII.   Non-Economic Damages

In their twelfth issue, Gregory and New Prime challenge the non-economic damages awarded to the Deol family as a result of his death. The jury awarded Deol's six family members, including his wife, his three children, and his parents, non-economic damages totaling $15,065,000. This figure excludes the $500,000 awarded to the estate for Deol's pain and mental anguish. Broken down by damage category and family member, the jury awarded the following.

| | Wife | Son | Son | Daughter | Mother | Father |
|---|---|---|---|---|---|---|
| Loss of past companionship | $350,000 | $160,000 | $160,000 | $160,000 | $160,000 | $160,000 |
| Loss of future companionship | $2,625,000 | $1,200,000 | $1,200,000 | $1,200,000 | $160,000 | $160,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Past mental anguish | $525,000 | $160,000 | $160,000 | $5,000 | $160,000 | $160,000 |
| Future mental anguish | $3,937,500 | $925,000 | $925,000 | $92,500 | $160,000 | $160,000 |
| Total | $7,437,500 | $2,445,000 | $2,445,000 | $1,457,500 | $640,000 | $640,000 |

Gregory and New Prime concede the Deol family suffered grief and loss as a result of Deol's death. But they contend the jury awards of non-economic damages suffer four problems. First, Gregory and New Prime claim the awards are excessive because they are disproportionate to the economic damages awarded to these individuals. Second, they contend the damages awarded were not individualized because some of the awards for certain categories of damages were consistent for every member of the Deol family. Third, they argue that the damages awarded were excessive compared to damages awarded or upheld in other wrongful death cases. Finally, they argue that there is not legally or factually sufficient evidence to support these awards and the awards were the result of improper closing argument. We address each of these arguments in turn.

A. Economic vs. non-economic damages

With respect to Gregory and New Prime's claim that the awards are excessive because they are disproportionate to the economic damages awarded,[13] they cite no controlling authority to support a proportionality requirement in wrongful death

---

[13] The jury awarded Deol's wife $925,200, his older son, H.D., $139,800, his younger son, A.D., $141,000, his daughter, G.D., $145,800, and his parents $1,200 each in pecuniary damages.

cases, and we have found none. Rather, they rely heavily on *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) to support their argument. But *Bentley* is a defamation case brought by a public official, which necessitated a careful review of the non-economic damage award to ensure it did not have a chilling effect on First Amendment-protected speech. As the court noted, "[d]amage awards left largely to a jury's discretion threaten too great an inhibition of speech protected by the First Amendment." *Id.* at 605. With this in mind, the court considered the plaintiff's $7 million mental anguish award and the $150,000 reputation damage award, and concluded that there was "no evidence" that the plaintiff suffered mental anguish in the amount of $7 million, "more than 40 times the amount awarded him for damage to his reputation." *Id.* at 607.

In addition to *Bentley*, appellants also rely on three other cases: *Exxon Shipping v. Baker*, 554 U.S. 471 (2008); *Bishop Abbey Homes v. Hale*, No. 05-14-01137-CV, 2015 WL 9167799 (Tex. App. – Dallas Dec. 16, 2015, pet. denied) (mem. op.); and *Gordon v. Redelsberger*, No.02-17-00461-CV, 2019 WL 619186 (Tex. App. – Fort Worth Feb. 14, 2019, no pet.) (mem. op.). But, like *Bentley*, these are not wrongful death cases. *Baker* addressed questions of maritime law related to the Exxon Valdez oil spill. *Baker*, 554 U.S. at 475–76. *Hale* involved faulty construction of the plaintiffs' "dream home," and this Court determined the ratio between pecuniary and non-pecuniary damages did not support the mental anguish damages awarded to the two plaintiffs. *Hale*, 2019 WL 619186, at *19. And

–35–

*Redelsberger* involved a confrontation in a parking lot in which the plaintiff suffered a gash above his eye. The court in *Redelsberger* affirmed the jury's award for past and future physical pain and mental anguish, but it suggested a remittitur of damages awarded for past and future physical impairment based on a lack of evidence of losses resulting from any physical impairment. *Redelsberger*, 2019 WL 619186, at *14–15.

Death is different. In wrongful death cases, the emotional impact of the loss of a beloved person is *the most significant damage* suffered by surviving relatives. *Moore v. Lillebo*, 722 S.W.2d 683, 685 (Tex. 1986). One can experience crushing mental anguish and loss of companionship from the death of a family member even without experiencing significant pecuniary loss. One has little, if anything, to do with the other. As shown in our review of the evidence below, the focus is on the relationship between the decedent and the survivor. Given that mental anguish and loss of companionship are heavily dependent on the relationship between the deceased and the beneficiary, we reject Gregory and New Prime's proportionality argument.[14]

---

[14] We acknowledge that our sister court invoked a proportionality requirement in *Lane v. Martinez*, 494 S.W.3d 339 (Tex. App. – Eastland 2015, no pet.), a wrongful death case. The *Lane* court, however, based its excessiveness determination on its conclusion that the jury simply picked numbers and put them in the blanks. *Id*. at 350. Although it did refer to proportionality between pecuniary and non-pecuniary damages as a "benchmark," it considered proportionality alongside several other factors that supported its ultimate conclusion that the non-pecuniary damages at issue in that case were improper because they were not the result of an individualized analysis. *Id*. at 351. We also note that *Lane* is not binding on this Court, and to the extent it suggests that courts of appeal should consider the ratio between economic and non-economic damage in determining excessiveness of non-economic damages in wrongful death cases, we disagree; such

B. Individualization of Awards

Next, Gregory and New Prime contend the damages awarded were not individualized because some of the awards for certain categories of damages awarded were consistent for every member of the Deol family. But, under some circumstances, it may be proper to award similarly situated individuals like amounts. *See, e.g.*, *JBS Carriers, Inc. v. Washington*, 513 S.W.3d 703, 718 (Tex. App.—San Antonio 2017) (rejecting defendants' criticism that jury awarded all three adult children "the same amount" for mental anguish and loss of companionship from their mother's death), *rev'd on other grounds*, 564 S.W.3d 830 (Tex. 2018).

Moreover, the record belies appellants' contention that the jury simply picked numbers and put them in the blanks. Guillermo Vasquez, Alma Perales, and Deol's wife, Jaswinder, were the three surviving spouses in this lawsuit. While the jury awarded the three spouses the same amounts in past mental anguish ($525,000) and past loss of companionship ($350,000), they awarded Guillermo significantly less in future mental anguish and loss of companionship compared with Alma and Jaswinder, apparently accounting for Guillermo's poor health and advanced age. This difference in treatment reflects a careful and sensitive analysis on the part of the jury. As for Alma and Jaswinder, the jury could have determined that both

---

practice is contrary to decades of jurisprudence observing that mental anguish and loss of companionship damages are unliquidated and incapable of precise mathematical calculation. *Thomas v. Uzoka*, 290 S.W.3d 437, 454 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (collecting cases).

women were entitled to similar figures – both had been without their husbands for the same amount of time, both of their husbands were killed in the same manner, both learned of their husbands' deaths in tragic ways, both were left as widows with children to raise and without the primary source of their household's income, and both women testified compellingly about the closeness of their relationships with their respective husbands.

Deol left behind three young children, A.D., H.D., and G.D. At the time of trial, A.D. and H.D. were 12 and 14 years old, respectively, and G.D. was 4 years old. All three children were awarded the same amounts in past and future loss of companionship. A claim for loss of companionship and society asks "what positive benefits have been taken away from the beneficiaries by reason of the wrongful death?" *Lillebo*, 722 S.W.2d at 688. It is entirely reasonable for the jury to conclude the positive benefits lost would be similar for three young children of the same father, who had been without him, and would be without him in the future, the same amount of time. The evidence at trial established that Deol was a doting father who was heavily invested in all three of his children's lives, and the jury could have determined that they were deprived of the same benefits because of his death and this deprivation would continue their entire lives.

In comparison, the jury did not award the children the same past and future mental anguish awards. G.D., who was an infant when Deol was killed, was awarded significantly less than her brothers. While her brothers were each awarded $160,000

in past mental anguish, the jury awarded G.D. only $5,000. And, although her brothers were awarded $925,000 in future mental anguish, G.D.'s award was one-tenth of this amount, $92,500. The jury clearly considered the differing circumstances of the Deol children and factored them into the awards.

Deol's father, Darshan, and his mother, Jagtar, were each awarded $160,000 across all categories of non-economic damages. The fact that the amounts are equal does not mean they were random or a product of the jury failing to properly deliberate on the amounts each party was entitled to recover. Instead, the equal amounts may easily reflect the similarities of the parents' situations including their ages (71 and 75 at the time of trial) and that they both lived with Deol and his family at the time of his death.

We accord respect to a jury's award of non-economic damages when the record demonstrates careful consideration of what amounts to assess. A jury demonstrates this level of care where, as here, it awards different claimants different amounts for different categories of non-economic damages. *Serv. Corp. Int'l v. Aragon*, 268 S.W.3d 112, 121–22 (Tex. App. – Eastland 2008, pet. denied). Overall, we find that the jury exercised the requisite level of care in determining the non-economic damage amounts awarded to each member of the Deol family and we reject Appellants' argument that the jury simply picked numbers at random and filled them in the blanks.

C. Comparison with other wrongful death cases

Gregory and New Prime also argue that comparing the awards made in this case with awards in similar cases confirms that these awards are excessive. Appellants reference several cases involving "similar circumstances: the death of a spouse, father, and adult child," and argue generally that the awards at issue are higher than the average awarded in those cases. But each award of non-economic damages is a unique exercise of the jury's discretion. *Primoris Energy Servs. Corp. v. Myers*, 569 S.W.3d 745, 760 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("'Because the measure of damages in a personal injury case is not subject to precise mathematical calculation, each case must be measured by its own facts, and considerable latitude and discretion are vested in the jury . . . Therefore, comparison with other cases or amounts of verdicts is 'generally of little or no help.'" (quoting *U-Haul Int'l., Inc. v. Waldrip*, 322 S.W.3d 821, 855-56 (Tex. App.—Dallas 2010), *rev'd in part*, 380 S.W.3d 118 (Tex. 2012); *see also Emerson Elec. Co. v. Johnson*, 601 S.W.3d 813, 845 (Tex. App.—Fort Worth 2018, pet. granted) (mem. op.) (each case must be measured by its own facts, and because appropriateness of award turns on specific facts of case, "referencing the amounts awarded in other cases is of limited help to a court reviewing the sufficiency of the evidence to support an award."); *George Grubbs Enters., Inc. v. Bien*, 881 S.W.2d 843, 858 (Tex. App.—Fort Worth 1994) (comparisons with other cases or verdicts of little help because same loss will result in different damages to different individuals), *rev'd on other*

*grounds*, 900 S.W.2d 337 (Tex. 1995); *Harris v. Balderas*, 949 S.W.2d 42, 44 (Tex. App.—San Antonio 1997, no writ) (explaining there is no certain standard by which personal injury damages can be measured; each case must stand on own facts and circumstances, and comparison with other cases on amounts of verdicts is of little or no help).

Other wrongful death cases are informative only insofar as those cases identify relevant <u>factors</u> that can indicate a particular damage award is excessive in light of the evidence presented. *Critical Path Res., Inc. v. Cuevas*, 561 S.W.3d 523, 568 (Tex. App.—Houston [14th Dist.] 2018, pet. granted, judgm't vacated w.r.m.). For example, an award of mental anguish damages may be considered excessive if there is little evidence to show the nature, duration, or severity of the anguish. *See id.* Because each award must be measured against its own supporting facts, however, a simplistic comparison of the amounts awarded in this case to the amounts awarded in other cases is of no analytical or persuasive value. *See id.* To successfully mount a challenge to the amount of the award, appellants were required to apply the factors identified in the cases they cite and explain how they show that the awards in this case are excessive based on the facts presented. *Id.* Appellants made no attempt to do this. The mere fact that the cases they cite are wrongful death cases involving damage awards to family members does not, by itself, explain why the awards in those cases dictate a lesser amount is appropriate here.

D. <u>Legal and Factual Sufficiency</u>

Appellants claim that, rather than awarding damages based on specific evidence presented, the jury appears to have started with the $39 million figure counsel for the Vasquez/Perales family suggested in closing argument and worked backwards. In his argument, counsel stated: "But if you don't like any of the [earlier] analysis with respect to damages, then think about it this way . . . [J]ust give them your two cents' worth . . . six cents a mile for the six hundred and fifty . . . million miles they traveled in the year that they took these people's lives. . . . Just give them your two cents' worth. That's $39 million." The jury awards to both the Vasquez/Perales and Deol families totaled $38,801,775. We first address appellants' argument that the non-economic damage awards in this case were the result of improper closing argument and then review the awards under the applicable standard of review.

1. <u>Counsel's statement</u>

The above statement, made by counsel for the Vasquez/Perales family, came in without objection and without comment by counsel for Gregory and New Prime during their closing argument. This statement was one of many arguments counsel made concerning damages during closing argument, including, but not limited to, the following:

> The instruction is to compensate in this case. And that is your juror's call to action. The action required is to equalize the money with the harms and the losses. The word "compensate" in trial

means to balance. And the requirement to compensate means that the weight of the harm must be balanced by the weight of the compensation. *And the law in every courthouse in America says nothing goes on the scale but the losses and harms caused by negligence, no outside reason.* Your most important job is to make sure everyone follows that law.

. . . This is important because if your verdict is for less than the full and fair amount that equalizes the harms, *if your verdict is some symbolic amount or some token amount or anything less than the full measure of losses and harms, if you take any outside reason into account even a little, then the law has not been fulfilled.*

And what are the harms and losses in this case? You've heard the evidence. You've met the family and heard about what used to be, a wife and a mother gone, a husband and a father gone, incredible pain, physical and emotional suffering, the loss of a limb, the drastic changes to all of their lives.

And when I think of Guillermo and his injuries and when I think of Guillermo and losing his wife and his son-in-law, and when I think of William and Alma losing their mother, and when I think of Alma losing her husband, and Noah and Elijah losing their father and their grandmother and an entire generation, two generations of family wiped out and a family destroyed and losses that will go on for (unintelligible), in some cases a combined 50 years, *I can't imagine that you wouldn't consider the total for those losses somewhere between 30- and 40 million.* But that is my suggestion. It is my obligation to give you that. It is your decision and your decision alone. You might think more; you might think less. That would be your call, but that's my suggestion of awarding to these folks.

(Emphasis added).

Clearly then, although counsel for the Vasquez/Perales family made the complained-of statement which culminated in a suggestion that the jury award $39 million, that statement must be considered in the context of counsel's preceding

–43–

remarks that accurately set out the standards and factors applicable to non-economic damages. Counsel's comment regarding "six cents a mile" put into perspective the $30 million to $40 million amount he suggested the plaintiffs were entitled to receive based on the facts presented. In addition, counsel for appellees addressed the appropriate factors relevant to non-economic damages during both voir dire and opening statements. Finally, the jury charge correctly instructed the jury on the law to consider in awarding non-economic damages, and unless the record demonstrates otherwise, we presume the jury followed these instructions. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex. 2003). Appellants point to nothing in the record nor any authority that would provide a rational basis for us to conclude that the complained-of statement led the jury to make its decisions on an improper basis or affected the jury's award of non-economic damages in this case.

    2. Sufficiency of the Evidence

In determining whether damages are excessive,[15] we employ a factual sufficiency analysis. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986) (per curiam); *Balbuena v. Balbuena ex rel. Balbuena*, No. 05-02-00459-CV, 2002 WL 31646678, at *3 (Tex. App.—Dallas Nov. 25, 2002, no pet.) (not designated for publication). We can set aside a verdict only if it is so contrary to the overwhelming weight of the

---

[15] Appellants concede that members of the Deol family experienced some mental anguish and loss of companionship such that these questions were correctly submitted to the jury. Appellants challenge only the amounts of the awards contending they were excessive.

evidence that the verdict is clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). The nebulous issues of mental anguish and loss of companionship and society are "inherently somewhat imprecise." *Uzoka*, 290 S.W.3d at 454. Because these damages are unliquidated and incapable of precise mathematical calculation, once the existence of non-economic loss is established, the jury is given significant discretion in fixing the amount of the award. *Id.* We take that into account when we conduct a meaningful review of the quantum of any such award. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Juries must find an amount that would fairly and reasonably compensate for the plaintiffs' loss.

Damages at Issue

In wrongful death cases, mental anguish damages and loss of companionship and society damages both compensate for non-economic losses. *Lillebo*, 722 S.W.2d at 687. Mental anguish is concerned not with the benefits the claimants have lost, but with the direct emotional suffering experienced as a result of the death. *Id.* at 688. Compensation for mental anguish can be awarded only for such anguish that causes "substantial disruption in daily routine" or "a high degree of mental pain and distress." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). However, in wrongful death cases, proof of mental anguish does not require evidence of physical symptoms such as sleeplessness, weight loss, nervousness, personality changes, and the like. *Lillebo*, 772 S.W.2d at 686–87. Proof of the familial

relationship alone "constitutes some evidence" of the mental anguish a surviving family member experiences when another member dies. *Id.* at 686.

While mental anguish focuses on the negative impact the wrongful death had on the beneficiaries, a claim for loss of companionship and society asks "what positive benefits have been taken away from the beneficiaries by reason of the wrongful death?" *Id*. at 688. Damages for loss of companionship and society are intended to compensate the beneficiary for the positive benefits flowing from the love, comfort, companionship, and society that the beneficiary would have received had the decedent lived. *Id.* at 687–88. In awarding damages for mental anguish and loss of companionship in a wrongful death case, the jury may consider (1) the relationship between husband and wife or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities. *Id*. at 688. The jury charge in this case properly instructed the jury on these factors.

<u>Trial Testimony Relevant to the Awards</u>

The evidence presented at trial established Deol was 45 years old at the time of his death and his life expectancy was 78.4 years. Accordingly, had Deol survived the accident, he was expected to live another 33 years. Deol's wife, Jaswinder, testified regarding the effect of Deol's death on her and her family members and

about the positive influences Deol had on them.[16] *See Woodruff*, 901 S.W.2d at 444 (mental anguish evidence can come from testimony of third parties).

Counsel's questioning of Jaswinder spans over fifty pages of the reporter's record. Jaswinder testified that she and Deol first met in India when she was 16 or 17 years old. Deol courted her for a year before she would speak to him and they began dating. Eventually, Jaswinder's family moved to Canada and Deol's family moved to the United States. Jaswinder's parents wanted an arranged marriage for her with someone else, but she and Deol loved each other and fought for their relationship. She stated that, throughout her and Deol's struggle for acceptance with her family, she knew they were meant to be.

Jaswinder and Deol had three children together, and she described their family as very close. They enjoyed many activities and traveling together. Jaswinder worked part-time, and Deol was the primary financial provider for their extended family that included Deol's parents, who lived with them. Deol "did everything" for the family. He loved cooking and working in the garden, and he would help out around the house. Jaswinder and Deol were "very, very close." He was "everything" to her and was her "best friend." Even when he was on the road working, Jaswinder would call and consult with him about "every single thing." Even now, when she's

---

[16] Jaswinder testified the children were at home in Bakersfield, California with their grandparents. She explained she did not bring the children to court because she did not want them to hear about the accident. She stated it was hard for her to be there.

stressed, she finds herself talking to Deol. Deol had been excited to experience their children's milestones, and she misses Deol every time her children do something memorable, like when G.D. crawled for the first time. She stated she "misses everything" about her husband.

The night of the accident Jaswinder tried calling Deol a "hundred times." She was concerned because he always answered her calls on the first ring. The following evening, Jaswinder arrived home from work to find the house full of relatives. The police had earlier informed Deol's father that Deol had been killed, but the family did not want to tell Jaswinder because they were afraid she would become hysterical in front of the children. When Jaswinder learned the police had come by, she became worried. She began calling hospitals in Texas looking for Deol. Eventually she found a business card with the phone number for the local police, and she called and left a message. Shortly thereafter, someone returned her call and told her that Deol had been killed. She described that moment as "the saddest moment of her life." She has no memory of what happened next, and she doesn't remember how her children learned their father was dead. At the funeral she "was out of [her] mind." She stated she could not recall the funeral or how she got there.

Consistent with tradition, Jaswinder and the family traveled to India to spread Deol's ashes in a river. Although it is also tradition to pass out the deceased's clothing to the poor, Jaswinder could not bring herself to part with Deol's

belongings, and she bought new clothes for the poor instead. Jaswinder stated she saved all of Deol's belongings, including his electric razor that still has his hair in it.

Since Deol supported the family, they could not afford to keep their house after his death. Jaswinder was forced to relocate the family from Maryland to California so that she could work for Deol's brother. She stated they can no longer pay for the things they used to enjoy.

Jaswinder began taking anti-depressant medication, which she was still taking at the time of trial. She described Deol as "the love of her life," and she misses him "every single moment." She said the home environment is "very sad" and Deol's death "destroyed" her family. They no longer celebrate birthdays and she sometimes misses parent-teacher conferences because they are too difficult without Deol.

When the children learned of Deol's passing, H.D., the oldest, sat with Jaswinder and held her. A.D. went to his room and would not talk to anyone. H.D. and A.D. were very attached to Deol, whom Jaswinder described as a loving father. Before Deol's death, H.D. was happy. Now he is in pain and very quiet. He does not talk much and stays to himself. Jaswinder stated he no longer has a role model. H.D. was given two tickets to his middle school graduation. He brought one ticket home telling Jaswinder "we do not need two." He then went to his room and cried. Deol and H.D. used to play video games, ride bikes, and play basketball. Deol used to put H.D. and A.D. to bed, and he would stay with them until they fell asleep.

Since Deol's death, A.D. has gained a lot of weight. He was more active before Deol's death because he and Deol often did things together. Now A.D. just sits with Jaswinder and reads. He seems depressed most days and frequently talks about his dad. A.D. was in a gifted program in Maryland, but after they moved to California, advanced classes were no longer an option because of the expenses involved. Jaswinder stated they also do not travel anymore because she does not like to drive on the highway and they do not have enough money. Both boys continue to cry out for their father.

G.D. was seven months old when Deol died. Deol loved G.D. deeply, and when she was born he would not allow other family members to hold her. Jaswinder testified that G.D. notices other children have fathers and she asks frequently about hers. G.D. sees pictures of Deol in the house and asks when he's coming home, and whether they are going to go pick him up from the airport. Jaswinder stated she can't bring herself to face G.D. when she asks about her dad and, when G.D. notices that her questions make Jaswinder sad, she will stop asking. According to Jaswinder, G.D. recognizes the family is struggling financially and when she sees things in the store that she wants, she will say it is too expensive, even when Jaswinder is willing to buy it for her.

At the time of Deol's death, Deol's mother, Jagtar, was 71 years old and his father, Darshan, was 75. Deol and Jagtar were very close. They used to cook and garden together. Since Deol's death, she cries multiple times every day. Darshan

learned of his son's death from the police officer who visited the house. He arranged to have his son's body transported back to Maryland for the funeral, and he traveled with Jaswinder to India to spread his son's ashes. While Darshan does not cry in front of Jaswinder, she explained that since Deol's death, the entire family's living environment is sad and everything has changed.

Jury Instructions

The jury instructions defined loss of companionship and society to mean "the loss of the positive benefits flowing from the love, comfort, companionship, and society that [each Deol family member], in reasonable probability, would have received from Bhupinder Singh Deol had he lived." The instructions also defined mental anguish as "the emotional pain, torment, and suffering experienced by [each Deol family member] because of the death of Bhupinder Singh Deol." The trial court further instructed the jury that it could consider the relationship between Deol and each Deol family member, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities. *See Lillebo*, 722 S.W.2d at 688 (describing these elements for jury's consideration in wrongful death cases). The trial court also instructed the jury not to include damages for one element in the others.

Under *Golden Eagle Archery*, we must presume that the jury followed these instructions and did not award damages for one element more than once unless the record shows otherwise. 116 S.W.3d at 771. Thus, in determining the damages, the

jury charge permitted the jury to make its own determination of how to categorize and compensate the Deol family based on the evidence presented about the damages caused to the family because of Deol's death. *Id.* at 770.

Jaswinder

The jury awarded Jaswinder $350,000 in loss of past companionship, $2,625,000 in loss of future companionship, $525,000 in past mental anguish, and $3,937,500 in future mental anguish, for a total of $7,437,500 in non-economic damages. Appellants do not specify which of these awards they believe to be excessive, nor do they specify in what respect the evidence is lacking to support these different awards. Appellants did not subject Jaswinder to cross-examination, nor did they address any of the plaintiffs' damages in their closing argument. Appellants' motion for judgment notwithstanding the verdict simply alleged there was "no evidence" to support each category of damages for each plaintiff.

The evidence presented established Jaswinder had a long and loving relationship with Deol, and she was dependent on him both financially and emotionally. From the evidence presented, the jury could have found Jaswinder and Deol had an extremely harmonious relationship and shared the love of their family and the nurturing and education of their children. In addition, the evidence supports a finding that Jaswinder has suffered tremendous grief and depression since Deol's death, and that her grief had not waned over the years. Gregory and New Prime concede that the way Jaswinder learned of her husband's demise was tragic. Her

testimony established she was left to wonder for over a day where he was and what had happened to him and that she was devastated when she learned of Deol's death.

The evidence showed Deol's death significantly and permanently changed Jaswinder's life. She no longer has Deol to provide emotional and financial support. The jury could have reasonably concluded Jaswinder and Deol had a very special, symbiotic relationship, the loss of which is likely to leave long-lasting emotional devastation. *See, e.g., Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1453 (5th Cir.), *amended on other grounds on rehearing*, 905 F.2d 61 (5th Cir. 1990). Accordingly, we conclude the evidence supporting Jaswinder's mental anguish and loss of companionship damages more than satisfies the *Lillebo* factors for reviewing awards for excessiveness. Jaswinder's testimony was thorough, detailed, non-conclusory, and compelling, and the jury's awards were not so contrary to the overwhelming weight of the evidence that the verdicts were clearly wrong and unjust.

<u>Deol's Children</u>[17]

A.D. was 8 years old and H.D. was 10 years old when Deol died. According to the trial record, Deol was very close to both his sons. Both boys have demonstrated significant and continuing grief over Deol's death. The boys no longer

---

[17] It is unclear which non-economic damage awards appellants challenge, but in their opening brief appellants complain that there was no evidence revealing "true mental anguish" for Deol's children. In their supplemental briefing, appellants complain that the lost companionship awards for Deol's children were identical and the jury gave the same amount for their mental anguish damages.

enjoy their father's guidance and companionship, and they cannot afford to do the things they used to do. From the evidence presented, the jury could have reasonably concluded Deol's death had a profound and lasting impact on H.D. and A.D. Again, the evidence developed at trial supports the *Lillebo* factors, and the jury's awards to H.D. and A.D. of $160,000 for loss of past companionship, $160,000 for past mental anguish, $925,000 for future mental anguish, and $1,200,000 for loss of future companionship were not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

With respect to G.D., while she was situated differently than her brothers because she was an infant at the time of Deol's death, there was evidence that she has experienced mental anguish and loss of companionship due to the loss of her father. Jaswinder testified Deol was extremely protective of G.D. from the time she was born. The jury could infer from this that G.D. bonded with Deol and he provided a sense of security that was no longer present after he died. Along with the evidence that G.D. was aware of, and troubled by, the absence of her father, the jury was free to consider the emotional turmoil and other disruption that Deol's death caused in the home. While the evidence concerning G.D.'s mental anguish was not as fully developed as it was for her brothers, the jury's award of only $97,500 in past and future mental anguish accounted for this.

As to loss of companionship and society, the record established Deol was a loving father and provided financial and emotional support to his family and

promoted the education of his children.  While G.D. was young at the time of Deol's death, the jury could have reasonably concluded her loss of the companionship and society of Deol was no less than that of her brothers.  Accordingly, we conclude the jury's award of $1,360,000 to G.D. for past and future loss of companionship and support is not clearly wrong or manifestly unjust.

Deol's Parents

The evidence established Deol's parents lived with Deol and his family.  Four years after Deol's death, his mother still cries every day.  Given the manner in which Deol died, the closeness between Deol and Jagtar, and the severe emotional distress she exhibited, we conclude a reasonable jury could conclude she suffered significant mental anguish and a loss of companionship as a result of Deol's death.

While we acknowledge there was less testimony specific to Deol's father, the jury was free to consider the general testimony about how the whole family was living together in one house and that the household as a whole was "destroyed" by Deol's death.  In addition, the jury heard how Darshan was the first to learn of his son's death from the police officer who visited the house and how he felt he had to keep this information from Jaswinder.  It was Darshan who arranged to have his son's body transported back to Maryland, and he made the long trip with Jaswinder to India for the solemn purpose of spreading Deol's ashes.  Because Deol was the family's primary caretaker, the entire family was forced to move cross-country so that Jaswinder could find full-time work.  Finally, Darshan has had to watch his wife

cry multiple times a day, every day, since their son was killed. The fact that Deol's father may not have expressed his grief in the same manner as the other members of his family, did not preclude the jury from finding he has suffered, and will continue to suffer, equally.

It is uniquely the province of the jury to quantify matters of non-economic damages. *See United Rentals N. Am., Inc. v. Evans*, No. 05-18-00665-CV, 2020 WL 4783190, at *12 (Tex. App.—Dallas Aug. 18, 2020, pet. filed). "As long as there is sufficient probative evidence to support the jury's verdict, this Court will not substitute its judgment for that of the jury." *Id*. In the absence of a showing that passion, prejudice, or other improper motive influenced the jury, the amount assessed by it will not be set aside as excessive. *Id*. A large award, in and of itself, does not show that the jury was influenced by passion, prejudice, sympathy, or other circumstances not in evidence. *Id*. For us to reverse an award, it must be flagrantly outrageous, extravagant, and so excessive that it shocks the judicial conscience. None of the awards at issue here meet this criteria. We conclude the evidence supports the amounts awarded to each member of the Deol family.

### IX.  Cumulative Error

In their final issue, Gregory and New Prime contend the cumulative effects of the matters they assert as the trial court's errors in this case requires reversal and remand for a new trial. Texas courts recognize the doctrine of cumulative error, wherein a reviewing court may reverse a lower-court judgment when the record

shows a number of instances of error, "no one instance being sufficient to call for a reversal, yet all the instances taken together may do so." *Sproles Motor Freight Lines, Inc. v. Long*, 168 S.W.2d 642, 645 (Tex. 1943). To support reversal based on cumulative error, a complaining party must show that "based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to it." *Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 570 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998).

Here, Gregory and New Prime contend that the combination of the trial court's striking responsible third parties, failing to submit a charge instruction on unavoidable accident, and submitting improper broad form jury questions on negligent entrustment, negligent training, and negligent supervision, probably caused the rendition of an improper verdict. As discussed above, we have concluded there is no error in regard to Gregory and New Prime's complaints. When there are no errors to be considered as a combined whole for purposes of evaluating harm, we reject cumulative error arguments. *In re BCH Dev., LLC*, 525 S.W.3d 920, 930 (Tex. App.—Dallas 2017, orig. proceeding) (citing *Caro v. Sharp*, No. 03-03-00108-CV, 2003 WL 21354602, at *8 (Tex. App.—Austin June 12, 2003, pet. denied) (mem. op.)).

## CONCLUSION

We overrule Gregory and New Prime's first through tenth and twelfth through thirteenth issues. We affirm the trial court's judgment.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

Whitehill, J., concurring in part and dissenting in part, joined by Richter, J.

Schenck, J., concurring in part and dissenting in part, joined by Browning, J. and Richter, J.

180167F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

SARAH GREGORY AND NEW
PRIME, INC., Appellants

No. 05-18-00167-CV     V.

JASWINDER CHOHAN,
INDIVIDUALLY AND AS NEXT
FRIEND AND NATURAL
MOTHER OF G.K.D., H.S.D., AND
A.D., MINORS, AND AS
REPRESENTATIVE OF THE
ESTATE OF BHUPINDER SINGH
DEOL, DARSHAN SINGH DEOL,
AND JAGTAR KAUR DEOL,
GUILLERMO VASQUEZ,
WILLIAM VASQUEZ,
INDIVIDUALLY AND AS
ADMINISTRATOR OF THE
ESTATE OF ALMA B.
("BELINDA") VASQUEZ, ALMA
J. PERALES, INDIVIDUALLY
AND AS ADMINISTRATOR OF
THE ESTATE OF HECTOR
PERALES AND AS NEXT FRIEND
OF MINOR N.P., Appellees

On Appeal from the County Court at
Law No. 5, Dallas County, Texas
Trial Court Cause No. CC-15-02925-
E.
Opinion delivered by Justice
Reichek. Court sitting en banc.

In accordance with this Court's opinion of this date, the judgment of the trial
court is **AFFIRMED**.

–59–

It is **ORDERED** that appellees JASWINDER CHOHAN, INDIVIDUALLY AND AS NEXT FRIEND AND NATURAL MOTHER OF G.K.D., H.S.D., AND A.D., MINORS, AND AS REPRESENTATIVE OF THE ESTATE OF BHUPINDER SINGH DEOL, DARSHAN SINGH DEOL, AND JAGTAR KAUR DEOL recover their costs of this appeal and the full amount of the trial court's judgment from appellants SARAH GREGORY AND NEW PRIME, INC. and from Atlantic Specialty Insurance Company as surety on appellants, supersedeas bond.

Judgment entered November 30, 2020